188 So. 711

HOPE v. MADISON.

No. 35164.

April 3, 1939.

Rehearing Denied May 1, 1939.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, for appellant.

Campbell & Campbell, of Minden, and Herold, Cousin & Herold, of Shreveport, for appellee.

ODOM, Justice.

The plaintiff, Mrs. Eleanor M. Hope, is the owner of 740 acres of land in Webster Parish. On June 22, 1936, by private act acknowledged before a notary, she sold to the defendant, Charles C. Madison, an undivided ⅓ interest in all of the oil, gas,

and mineral rights, royalty, rents, and privileges in and to said lands, "in consideration of the sum of One Dollar ($1.00) and other valuable considerations, the receipt of which is hereby acknowledged".

The purpose of this suit is to annul and set aside that sale. From a judgment rejecting her demands and dismissing her suit, she prosecutes this appeal.

As a cause of action, she alleged in her original petition that the consideration for the sale of the minerals was that Madison, who is an attorney-at-law, obligated himself to file suit at his own expense and to prosecute the same to successful completion, to obtain a cancellation of two oil and gas leases which she had made covering the land which she owned; that suit was filed for that purpose, "although petitioner has been informed that the said Charles C. Madison did not prepare said suit, although appearing as one of the attorneys of record."

She further alleged that, although she made repeated demands upon Madison to do so, he "failed and refused to proceed further with said suit and to prosecute the same diligently to a successful termination in accordance with his obligation and in fact failed and refused to render any assistance in said suit whatsoever", and therefore "there was no consideration for the mineral sale referred to in paragraph 2, above."

She alleged that Madison had received in excess of $14,000.00 for leases on a portion of said mineral interest, which was then deposited in a bank in Shreveport, La., under an escrow agreement, which amount,

she alleged, belonged to her. Madison being a non-resident, she prayed that said amount be attached and that she be decreed the owner thereof, and prayed for judgment "cancelling and annulling that certain mineral deed" which she made to Madison.

In this petition plaintiff makes it perfectly clear that her cause of action for setting aside the mineral sale was that the sale was made without consideration.

The curator ad hoc appointed to represent Madison, the absentee defendant, filed a plea of estoppel, the basis of which was that in the instrument sought to be annulled plaintiff acknowledged and declared the receipt of the consideration therefor; and further, that on December 30, 1936, plaintiff joined the said Madison and Clifford E. Hays in a contract and agreement made in favor of J. G. Sellwood, in which agreement it was stipulated, and therefore admitted by plaintiff, that the minerals in and under said lands were owned in the following proportions: 32/48 owned by Mrs. Hope; 13/48 owned by Charles C. Madison, and 3/48 owned by Clifford E. Hays; and that on March 20, 1937, she joined said Madison and said Hays in the execution of a contract and agreement with a certain oil company, in which agreement she recognized that said Madison and said Hays owned interests in the minerals; that on the same day she joined said Madison and said Hays in the execution of an oil and gas lease to an oil company, in which it was stipulated that the minerals in and under said lands were owned by herself, Madison, and Hays, in the proportions above stipulated.

It is further alleged as a basis for the plea of estoppel that on February 13, 1937, the plaintiff joined the said Madison and the said Hays and one J. G. Sellwood in a suit styled "Eleanor M. Hope et als. v. Louisiana Oil Refining Corporation", in which suit plaintiff judicially acknowledged and asserted that she and other parties plaintiff were the owners of the oil and gas rights; and that on May 19, 1937, the plaintiff joined Madison, Hays, Hunt Oil Co., Sellwood, and J. B. Atkins in a suit against the Arkansas Fuel Oil Co., wherein plaintiff judicially declared and asserted that she, together with the other plaintiffs therein, were the owners of the oil, gas, and other minerals in and under 500 acres of the land.

All the above transactions, it is alleged, took place long after plaintiff made the sale to the defendant.

There was no ruling on the plea of estoppel, which was filed on January 7, 1938. With full reservation of his rights under the plea, defendant filed answer on January 21, which, in effect, is a general denial, and the case was set down to be tried on March 21.

On February 9, plaintiff filed, without objection on the part of defendant, a supplemental petition, in which it is stated that, at the time the original petition was filed, "her attorneys were not fully acquainted with all of the facts concerning her cause of action, so that it is necessary to amend".

Plaintiff alleged in this petition that her lands had been seized under a writ of attachment in a suit styled "C. M. Gordon v.

Mrs. Eleanor M. Hope", and that, as a result of a judgment rendered therein, her property had been sold to C. M. Gordon, the plaintiff therein; that said sale was void because of the plaintiff's failure to comply with some of the requirements of the law; that petitioner is a woman without business training or experience, and that during the years 1935 and 1936 and prior thereto the said Madison "acted as your petitioner's confidential agent with regard to this property and other matters", and that she had entire confidence in the said Madison, "believing him to be wholly devoted to her interest".

She further alleged that she granted certain oil, gas, and mineral leases affecting her property, and that said Madison advised her that suits should be brought to have the sheriff's sale made to the said C. M. Gordon declared null and to have said oil and gas leases cancelled; that said Madison represented to her that, although not a Louisiana lawyer, he was capable of bringing and prosecuting such suits, and told her that he would willingly handle these matters for her for his expenses and such additional amount as she might desire to pay him when his work was done, and that accordingly she authorized the said Madison to institute both suits, and that he agreed to do so on the terms and conditions named by her. She further alleged that she was ignorant and uninformed as to the value of her property or the minerals thereunder or the leases affecting the same, and relied wholly upon the representation and advice of the said Madison in such matters; that shortly prior to June 22, 1936, the date on which she made the sale to the said Madison, he advised her "that a conveyance of an undivided one-third interest in and to the minerals in and under the property hereinabove described would be a reasonable and just compensation to be paid him for bringing the aforesaid suits and carrying them through to final judgment".

She further alleged that said Madison knew that such representations were false and knew further that it was possible for him, as petitioner's agent, to have employed competent Louisiana attorneys to represent her and handle said suits' "for an interest in the minerals mentioned smaller than $\frac{1}{3}$", and that as a matter of fact the said Madison had already entered into an agreement with Clifford E. Hays, an attorney of Webster Parish, to perform all of the aforesaid services "for a relatively small interest in the aforesaid minerals". She further alleged that in her desire to accord said Madison fair treatment and pay him what his services were worth, she transferred to him an undivided $\frac{1}{3}$ interest in said minerals; that during all this time she thought said Madison was acting as her confidential agent and that she had assumed that he would perform such services for a fee as small as would have been charged her by a competent Louisiana attorney.

In Paragraph 9 of her supplemental petition she alleged that, after inducing her to execute the conveyance to him, "the said Charles C. Madison performed no services whatsoever for your petitioner, as he had promised to do"; that the suit was prepared by Hays, the Louisiana attorney, who performed all the services in connec-

tion therewith, "without any beneficial assistance whatsoever from Charles C. Madison, whose participation in the proceedings was confined to having his name signed to the pleadings as one of petitioner's counsel".

In Paragraph 12 of her petition plaintiff alleged that she had repeatedly demanded that said Madison prosecute to completion the suits which had been filed by Hays, but that said Madison, "after having obtained the conveyance of the mineral interest from your petitioner, lost interest in your petitioner's affairs, declined to proceed with the prosecution of the aforesaid suit or to render any assistance to your petitioner, and to Clifford E. Hays in connection therewith and openly stated that he would render no further services in connection with it; and similarly, the said Charles C. Madison has done nothing in preparing for the trial of the reconventional demand of C. M. Gordon against your petitioner".

She further alleged that the services of the said Madison to her were in fact valueless; and that, at the time the said Madison persuaded her to execute the aforesaid conveyance to him, an effort was being made to produce oil in the vicinity of her land, and that a well was then being drilled, which subsequently was brought in as a producer, "a fact of which your petitioner was ignorant" and of which said Madison was informed, and that he "intentionally omitted to advise your petitioner; and if your petitioner had known that the aforesaid well was being drilled and had known that the value of the right to produce oil, gas and other minerals from her lands was

such that Mr. Clifford E. Hays or other reputable Louisiana attorneys would have been willing to represent petitioner and do the work necessary to clear petitioner's title to the land for an undivided one-sixteenth (1/16) interest in the minerals, she would not have employed the said Charles C. Madison".

She further alleged, in Paragraph 15 of the supplemental petition, that, of the sum of $75,000 paid by H. L. Hunt for the lease of a portion of the aforesaid property, the said Madison accounted to her for only $44,000, when she should have received $50,000, and the said Madison owes her the entire sum of $26,406.25 that he received out of the $75,000 paid by Hunt for the lease.

She prayed, as in her original petition, for judgment cancelling and anulling the act of transfer made by her to the said Madison, and for judgment against him for $26,406.25.

Defendant's answer to this supplemental petition admits that he is an attorney-at-law, that plaintiff employed him to file and prosecute the suits mentioned, and admits the confidential relationship which existed between him and his client. But he especially denied that he had been unfaithful to his trust, denied that he had been negligent or inefficient in the bringing or prosecution of the suits mentioned, and denied that he had withheld from plaintiff any information to which she was entitled, and denied all imputations of fraud and unethical practices in his dealings with plaintiff.

We have set out at great length the substance of plaintiff's allegations in her first and supplemental petitions. This seemed necessary because counsel for plaintiff argued in the trial court, and contend here, that the sale of the mineral rights by plaintiff to defendant was a sale of a litigious right and was therefore null, under Article 2447 of the Revised Civil Code.

The basis of this contention is that, as shown by the court records of Webster Parish, at the time Mrs. Hope sold to Madison the mineral rights, the suit entitled Hope v. Gordon, which involved the validity of the sale of Mrs. Hope's land to Gordon, was pending in the Supreme Court (Hope v. Gordon, 186 La. 697, 173 So. 177). That suit was decided in favor of Mrs. Hope, and it was decreed that the proceedings under which the sale to Gordon was made were irregular, and it was ordered that the sale be annulled and that the inscription thereof be cancelled from the official records of Webster Parish.

 Therefore, at the time Mrs. Hope made the sale to Madison, the title to her land, and therefore the title to the mineral rights therein, was involved in litigation; and for that reason plaintiff's counsel argued before the court, and strenuously contend in their briefs, that that sale was an absolute nullity and should be set aside because it was a sale of a litigious right.

The trial judge says in his written opinion that this point was raised for the first time in his court in a supplemental brief filed by counsel for plaintiff. Counsel for defendant insist that, having failed to plead this issue, plaintiff should not be permitted to raise it by way of argument. Speaking of this point, the trial judge said:

"But I have heretofore decided that this issue cannot be raised for the first time in brief, in the face of the objection made to evidence that would enlarge the pleadings."

We approve his ruling on this point. Article 172 of the Code of Practice, which is found under the general heading "Requirements of Petition," says in Paragraph 4:

"The petition must contain a clear and concise statement of the object of the demand, as well as the nature of the title, or the cause of action on which it is founded."

What that means, and what it has always been understood to mean, is that one who comes to court with a complaint must so word his petition as to leave no reasonable doubt as to what he claims and why he claims it. The pleader must state clearly and concisely not only what he demands, or "the object of the demand", but why he demands it, or, as the Code says, "the cause of action on which it is founded".

The reason for this is that, in the absence of a clear and concise statement of the issues on which a plaintiff expects to rely, his adversary would be taken by surprise and come to court wholly unprepared to meet them.

Plaintiff in this case clearly stated in each of her petitions the object of her demand, or what she demanded, which was

to have annulled and set aside the sale of an undivided $\frac{1}{3}$ of the minerals in her land, which she made to defendant on June 22, 1936. She likewise, and as clearly and concisely, stated why she demanded that the sale be set aside—the ground of her complaint. In her original petition, after alleging that she had employed defendant, an attorney, to render certain professional services for her, which anticipated services were to be the true consideration for the sale, and that defendant had failed and refused to render those services, she set out that the sale should be set aside because "there was no consideration for the mineral sale referred to in paragraph 2, above".

Her supplemental petition in the main is nothing more than an enlargement of the reason set out in the original petition as to why the sale should be set aside, which was that there was no consideration therefor. She reiterated that defendant had rendered no services of any value to her; that he had employed a competent Louisiana attorney to assist him in bringing and prosecuting the suits contemplated; that the Louisiana attorney had done all the work without defendant's assistance and had accepted as compensation for his services a $\frac{3}{48}$ interest in the minerals, much less than she had transferred to defendant, and that, had she known that the services of the Louisiana attorney could have been procured for $\frac{3}{48}$ of the minerals, she would not have agreed to give defendant a $\frac{1}{3}$ interest therein. She alleged that defendant had taken advantage of her inexperience and ignorance, had deceived and imposed upon her—had gotten something for nothing; hence, that the sale was made without consideration.

She did add, however, that defendant had withheld from her certain information which he had relating to oil activities in the vicinity of her lands, which information had a material bearing on the value of mineral rights; that, had he divulged to her these facts, as it was his duty to do, she would not have made the sale for the consideration mentioned.

Her cause of action is set out at great length and in minute detail. A cause of action is an act on the part of a defendant which gives rise to a plaintiff's cause of complaint; "the existence of those facts which give a party a right to judicial interference in his behalf"; "the situation or state of facts which entitles a party to sustain an action".

"When used with reference to the pleadings by which the cause of action is alleged, the phrase signifies the facts upon which the plaintiff's right to sue is based, and upon which the defendant's duty has arisen, coupled with the facts which constitute the latter's wrong." Quotations from 2 Words & Phrases, First Series, Cause of Action, p. 1017.

Not once in either of her petitions did plaintiff mention the fact that, at the time she sold the mineral rights to the defendant, there was pending a suit involving the title to these rights. She did not ask relief or judicial interference in her behalf because of that fact. That was not the cause of her complaint. The case was

tried, argued, submitted, and briefed without mention of this point. The point was first brought up by counsel in a supplemental brief.

Counsel for plaintiff, in their argument that we should consider and decide the case on this point, say that the pleadings and the testimony disclose the facts that defendant was plaintiff's attorney at the time the sale was made; that there was then pending a suit involving the title of the thing sold; that the ownership of the minerals, the object of the sale, was being contested in a judicial proceeding then pending, and that therefore the court has before it sufficient "ultimate" facts to enable it to decide whether this was a sale of a litigious right.

■ As relates to the testimony referred to by counsel for plaintiff, the record shows that counsel for defendant repeatedly objected to the introduction of any testimony to enlarge the pleadings, that their objection was sustained by the trial judge, and his ruling was made general. The testimony referred to appears to have been admissible on some point raised by the pleadings and therefore could not be excluded and would not have enlarged the pleadings even if there had been no objection to its admissibility for that purpose. The rule which prevails in our practice is concisely stated as follows, in Succession of Dauphin, 112 La. 103, 127, 36 So. 287, 295:

"Evidence received without objection can enlarge the pleadings only where such evidence was inadmissible under the pleadings, and would have had to be excluded if objected to. As a matter of course, evidence admissible under the pleadings cannot have the effect of enlarging the pleadings. If it had such effect, the issues in every case would have to be ascertained from the evidence instead of from the pleadings." McAdam v. Soria, 31 La.Ann. 862; Mackesy v. Schultz, 38 La.Ann. 385; Rogers v. Southern Fiber Co., 119 La. 714, 44 So. 442, 121 Am.St.Rep. 537; Tensas Delta Land Co. v. Ferguson, 128 La. 171, 54 So. 708.

■ Courts can grant no relief for causes not complained of, and for that reason we shall not discuss or decide this point.

■ On the issues set up in her pleadings, plaintiff failed to make out her case. The testimony and all the surrounding circumstances completely overthrow her contentions. Her counsel state in their brief, beginning at page 18 thereof, that she "is the widow of George D. Hope, a successful lumberman who died more than twenty years ago, leaving her a comparatively large fortune", and that at the time of her husband's death a lawyer of Kansas City named Titus was his and her attorney, and that her affairs continued to prosper under his direction until his death. They state that, following the death of Titus, her affairs gradually got into a confused condition; that she spent "a considerable part of her time abroad and more or less left it to others to look after her business with the usual result that the business either went to the others or 'went to pot';" that she became involved in receiverships, bankruptcies, litigations, and other similar

troubles, during the course of which she employed several attorneys, none of whom was able to take the place of Mr. Titus.

They state that in the year 1934 Mrs. Hope confided to a friend named Cochran the whole story of her troubles, past and present; that Cochran suggested that she employ Mr. Madison, who was a capable and reliable attorney, to take charge of her affairs, with the view of retrieving some of the losses which she had sustained, among these losses being 16 lumber yards, and that "From the time that Madison went to see Mrs. Hope in 1934 at Cochran's suggestion he assumed charge of her affairs with her full consent and became her general counsel under a fee arrangement concerning which his tale and her tale sharply differ".

It is admitted in brief that Mrs. Hope employed Madison to bring suits in Oklahoma and Missouri "to recover the sixteen lumber yards that had been lost to her in some way she could not understand".

From counsel's brief and from the testimony we understand that, at the time Mrs. Hope employed Madison, she had lost her fortune, or the bulk of it; that her business had gone "to pot". It is stated in the brief and affirmatively shown by the testimony that her 740-acre tract of land in Louisiana had been sold under a writ of fi fa, and that another large tract situated in the State of Arkansas had been sold under like proceedings. It is conceded that she employed Mr. Madison to take charge of her affairs and do what he could for her on a contingent fee, as she had no funds with which to pay for his services. She says

that his employment related to the bringing of suits in Oklahoma and Arkansas and had nothing to do with her Louisiana affairs. But that Madison did make several trips to the State of Louisiana for the purpose of looking into the status of her property here is proved beyond question. The fact is that, until he came to Louisiana and investigated court and other records, neither she nor he knew that her property here had been sold, and that the first and only information she received as to the sale of that property was what was told her by Madison. He advised her that she should institute suits to recover the Louisiana property and to cancel certain mineral leases she had made, and it is abundantly shown that she authorized him to do so. That he, with the assistance of Mr. Hays, a Louisiana lawyer, did bring the suits and recover the property for her is shown by the records.

In connection with these suits, the question of his fee was discussed, and it was agreed that for his services Mrs. Hope would transfer to him an undivided $\frac{1}{3}$ interest in the minerals in and under the land, and that was done. Madison testified that he told her that it would be necessary for him to employ a Louisiana attorney to assist him and that he would "take care" of the Louisiana attorney, and another attorney who was interested with Madison, out of his share of the minerals. The record shows that for his services Mr. Hays, the Louisiana attorney employed by Madison, received $\frac{3}{48}$ interest in the minerals.

It is no doubt true, as Mrs. Hope alleged, that Mr. Hays rendered valuable profes-

sional services in connection with the suits. But it is not true that Madison rendered no services of value to plaintiff. The record satisfies us that Madison, from first to last, rendered all the assistance he could to Mrs. Hope and that his services were valuable to her. He made two trips to New Orleans to argue the case of Hope v. Gordon, 186 La. 697, 173 So. 177, before the Supreme Court, and on both occasions argued the case personally. He was vitally interested because his compensation depended upon the success of the lawsuit.

Mrs. Hope unquestionably knew that Madison intended to associate with him Louisiana counsel, and knew definitely, after the suit of Gordon v. Hope had been finally decided, just what compensation the Louisiana attorney was to receive for his services. This is shown by the conveyance and court records of the Parish of Webster. Six months after she made the sale to Madison and several months after the suit of Hope v. Gordon had become final, she joined with Madison and Hays in contracts which showed that the minerals were owned in the proportions of $32\!/\!48$ by Mrs. Hope, $13\!/\!48$ by Madison, and $3\!/\!48$ by Hays. One of these instruments, which is now of record, contains the following stipulation:

"It is stipulated, agreed and understood that said oil and gas lease and said mineral sale are granted and conveyed by the parties of the first part in the proportions of their respective ownerships of said property, to-wit."

Then follows a stipulation of the proportions as above stated. Not only that, but

Mrs. Hope, in the early part of 1937, joined Madison and Hays in two suits to cancel certain oil and gas leases which had been made by her to a certain oil company. She did not then complain that she had been deceived or defrauded. The mineral sales and leases made by her, Madison, and Hays netted her $44,000 cash.

A reading of the record leaves us in no doubt that Mrs. Hope had full knowledge relating to the employment of Louisiana counsel, and further, that Madison rendered professional services in accordance with his agreement with her. Furthermore, it is shown to our satisfaction that, at the time of the sale, the mineral rights had but little commercial value. Mrs. Hope's land was near the Cotton Valley Oil Field, which, so far as then was known, was completely exhausted. It was only after a subsequent deep-test well, drilled in the vicinity of her property, produced oil from a much deeper level than had theretofore been explored that her mineral rights became valuable.

The trial judge states his conclusion as to the whole matter as follows:

"From a careful study of the record in this case I have reached the conclusion that at the time of the execution of the mineral deed from plaintiff to defendant the expectation of winning the suit of Hope v. Gordon was not very high, and that the property had only speculative value, and consequently everyone was very well satisfied with the deal, but afterwards the property became valuable and when plaintiff saw what a nice fee defendant was collecting she became dissatisfied."

After a careful consideration of all the testimony, we concur in the view thus expressed by Judge McInnis.

There is no merit in Mrs. Hope's contention that the defendant withheld from her information which he had relative to the drilling of a deep-test well in the vicinity of her property. Not only did Mr. Madison convey this information to her, but Mr. H. B. McCray, who lives in Kansas City, testified that he was an intimate friend and business associate of Mrs. Hope's husband, and that on one occasion he came to Louisiana at the request of Mr. Madison to investigate the oil situation in the vicinity of Mrs. Hope's property and that he brought with him a nephew who was engaged in the oil business, and that the general outlook was not at all encouraging; that the reason he was asked to make the investigation was that Madison had requested him to sign a $2000 bond for Mrs. Hope in connection with a lawsuit she had in Oklahoma and to advance her the sum of $1000 to assist her, and that he wanted to find out whether the value of her property in Louisiana would justify his undertaking those obligations. He testified that the information which he received was such that he refused the request. He furthermore testified that, at the time he made the investigation, the deep test above referred to was being made. He was asked whether he told Mrs. Hope of this test and answered positively that he had told Mrs. Hope about it in the presence of Mr. Madison.

Mr. Rooney, who was called as a witness, testified that he was present when Mrs. Hope sold the mineral interest to Madison, that he signed the document as a witness, and that Mrs. Hope told him at that time:

"We are very hopeful of the situation in Louisiana. They are drilling a deep test well in the vicinity of this land in Louisiana and we are hopeful of the outcome."

The following statement of the trial judge is amply supported by the record:

"Plaintiff says if she had known everything she would not have made the conveyance, and I believe that is so, because what she did not know, and what defendant did not know, was that the suit of Hope v. Gordon would terminate in her favor, and that the well being drilled by the Ohio Oil Company would be completed as a good oil well, and that later her own land would produce in the deeper sands.

"What they all knew when the conveyance was executed was that the case of Hope v. Gordon had been lost by plaintiff in the district court and was on appeal to the Supreme Court, and that the Ohio Oil Company was drilling a well in the Cotton Valley field to test sands below 4600 feet."

For the reasons assigned, the judgment appealed from is affirmed, at plaintiff's costs.

HIGGINS, J., absent.