Morris G. MAHER

v.

The CITY OF NEW ORLEANS et al.

Civ. A. No. 71-119.

United States District Court,
E. D. Louisiana.

Feb. 21, 1974.

Walter M. Barnett, Harold B. Carter, Jr., Montgomery, Barnett, Brown & Read, New Orleans, La., for plaintiff.

Blake Arata, City Atty., Carl H. Vesy, Asst. City Atty., New Orleans, La., for defendants.

Jacob H. Morrison, New Orleans, La., for intervenors Vieux Carré Property Owners and Associates, Inc., French Quarter Residents Association, Louisiana Landmarks Society, and Crescent Council of Civic Ass'ns.

HEEBE, Chief Judge:

The original plaintiff in this action, Morris G. Maher, was the owner of properties located at 810 and 818–822 Dumaine Street in the Vieux Carré, or French Quarter, section of New Orleans. All property in the Vieux Carré, apart from a few specific exceptions, is subject to the provisions of the Vieux Carré ordinance passed by the City Council pursuant to a grant of authority contained in Art. XIV, Sec. 22A of the Louisiana Constitution. The ordinance creates the Vieux Carré Commission, a nine-member body charged with "the preservation of such buildings in the Vieux Carré section of the city, as in the opinion of the Commission, shall have architectural and historical value

and which should be preserved for the benefit of the people of the city and state." Code of the City of New Orleans § 65–6. The duties of the Commission include the review of detailed plans for any construction, demolition or alteration work done in the French Quarter. The ordinance also provides in part:

"Section 65–8. Submission of plans for exterior changes to Commission.

"Before the commencement of any work in the erection of any new building or in the alteration or addition to, or painting or repainting or demolishing of any existing building, any portion of which is to front on any public street or alley in the Vieux Carré Section, application by the owner for a permit therefor shall be made to the Vieux Carré Commission, accompanied by the full plans and specifications thereof so far as they relate to the proposed appearance, color, texture of materials and architectural design of the exterior, including the front, sides, rear and roof of such building, alteration or addition or of any out building, party wall, courtyard, fence or other dependency thereof. (C.C.S., Ord. No. 14,538, § 3; C.C.S., Ord. No. 15,085, § 1.)

"Section 65–9. Commission recommendations and action thereon.

"The Vieux Carré Commission shall upon due consideration report thereon promptly its recommendations, including such changes, if any, as in its judgment are reasonably necessary to comply with the requirements of this chapter, by sending them, in writing, to the Director of the Department of Safety and Permits with the application and documents referred to in this article and, if they are found by the Director to comply reasonably with the requirements of this article and if such application and intended work shall conform also to all other regulations, ordinances and laws of the city, the Director shall issue promptly a permit for such work and indicate on such permit the extent and nature of the work to be performed thereunder. (C.C.S., Ord. No. 14,538, § 3; C.C.S., Ord. No. 15,085, § 1.)

"Section 65–10. When Director to submit question to Council; action of Council.

"If the applicant for a permit shall refuse to accede to reasonable changes recommended by the Vieux Carré Commission, if the Commission shall disapprove any application or if the Director of the Department of Safety and Permits finds that the recommendations of the Commission do not comply reasonably with the requirements of this article, the Director shall within not later than five days, forward such matters with his written comments to the Council for such action as in its judgment, after notice and affording an opportunity to the applicant and to the Commission and other protesting parties to be heard, shall effect reasonable compliance with such recommendations and this article. (C.C.S., Ord. No. 14,538, § 3; C.C.S., Ord. No. 15,085, § 1.)"

Mr. Maher, until his recent death, resided at 810 Dumaine. The property at 818–820 Dumaine, a Victorian cottage next door to the residence, is the subject of over ten years of arduous and determined legal struggle.

In March of 1963, Mr. Maher applied to the Vieux Carré Commission for authority to demolish the cottage and replace it with an addition to his home. The addition would have included seven rent-producing apartments.

Although the Architectural Committee of the Commission had approved the construction plans, the Vieux Carré Commission disapproved the application to demolish on April 16, 1963. A number of property owners, the Vieux Carré Property Owners and Associates, Inc., the French Quarter Residents Association and the Louisiana Council for the Vieux Carré had strenuously opposed demolition.

On June 18, 1963, after considering a letter from Mr. Maher's architect, the

Commission voted to obtain a report from the Vieux Carré Survey Advisory Committee. The Committee was in the process of making an architectural analysis of the entire French Quarter through the use of a survey conducted by the Schleider Foundation in connection with Tulane University. That report classified the cottage as "worthy of preservation as part of the scene."

On September 17, 1963, the Vieux Carré Commission again disapproved of the application to demolish.

On October 31, 1963, Mr. Maher again applied to the Commission. On December 17, 1963, the Commission, meeting in a closed session, overruled its two previous decisions and granted the application to demonish.

On February 13, 1964, a group of property owners, acting under the name of the Vieux Carré Property Owners and Associates, Inc., appealed the decision of the Vieux Carré Commission to the City Council. The Council, after a hearing, resolved that the cottage had architectural or historical value, overruled the decision of the Commission and ordered the Director of the Department of Safety and Permits of the City of New Orleans not to issue a demolition permit to Mr. Maher.

On July 23, 1964, Mr. Maher filed suit in Civil District Court for Orleans Parish asking that the decision of the City Council be held null and void. At this time, it was agreed by all parties to the suit that the action of the Council was indeed void since the Council had considered the matter before Mr. Maher had requested a permit from the City Department of Safety and Permits to demolish the cottage. Mr. Maher applied to the Department for his permit but was refused. He then appealed to the City Council for a reversal of the action of the Department.

On August 16, 1966, after a hearing, the Council reaffirmed its previous ruling and overruled the Vieux Carré Commission's grant of the demolition permit.

The suit in Civil District Court was resumed, and on December 7, 1967, was tried. On February 26, 1968, Judge Garvey, without written reasons, rendered judgment "as prayed" in favor of the plaintiff.

On appeal, the Louisiana Court of Appeal for the Fourth Circuit reversed the trial court and dismissed the suit. The court, in an opinion reported at 222 So. 2d 608 (La.App.1969), held that the action of the City Council was proper and that the Vieux Carré Ordinance was constitutional both on its face and as applied in Mr. Maher's case.

Mr. Maher applied to the Louisiana Supreme Court for writs of review. These were granted, and the court affirmed the judgment of the court of appeal denying the demolition permit. In its opinion, the court held that the actions of the City Council were proper under Louisiana law but declined to consider any attack on the constitutionality of the ordinance since "no plea attacking its constitutionality for any reason was filed in the district court. * * * Consequently [constitutional issues] cannot be considered by us now." Maher v. City of New Orleans, 256 La. 131, 235 So.2d 402, 405 (1970). In a footnote, the court observed that

"Apparently without realizing that the constitutional issue had not pleaded (sic) in the trial court the Court of Appeal did pass on the constitutional question set out in assignment of error "B" and held that our decision (sic) in City of New Orleans v. Pergament, 198 La. 852, 5 So.2d 129 and City of New Orleans v. Levy, 223 La. 14, 64 So.2d 798 in which we maintained the validity of the ordinance had set at rest the question of whether or not the ordinance was subject to attack because it was too vague and indefinite. We are inclined to agree." 235 So.2d at 405, fn. 3.

In passing, the court noted that it was completely satisfied that "the Maher cottage composed part of the elusive 'tout ensemble' of the Vieux Carré as describ-

ed by this Court . . . and that it does have architectural value."

On January 14, 1971, Mr. Maher filed suit in this court seeking a declaration of the unconstitutionality of the Vieux Carré ordinance and an injunction against its enforcement. He, and now his estate, have challenged the constitutionality of the ordinance, both on its face and as applied.

The threshold legal issue in this case concerns the effect of the labyrinthine history of the dispute on the present federal suit. Defendants claim that the suit is barred by the law of *res judicata* and/or judicial or collateral estoppel. They rely on the proposition that a final judgment of a court having jurisdiction over the parties and the subject matter puts an end, not only to every plea or defense made, but to every plea or defense which either of the parties might have raised.

This view undoubtedly expresses a common law maxim but the law of Louisiana, in this area as in others, has grown from roots foreign to the common law heritage of her sister states.

*Res judicata* in Louisiana law is founded on Article 2286 of the Louisiana Civil Code of 1870, which is a literal translation of Article 1351 of the French Civil Code.[1] The article provides:

"The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action;[2] the demand must be between the same parties and formed by them against each other in the same quality."

Article 1351 of the French Civil Code is interpreted, with a few exceptions not relevant here[3], to mean that "[i]n general, it may be said that no matters except those of evidentiary nature are concluded by a judgment, unless they were actually submitted to the decision of the court." O'Quin, Res Judicata—"Matters Which Might Have Been Pleaded" 2 La.L. Rev. 340, 364 (1940), hereinafter referred to as O'Quin I. For example, in French law "failure in a suit for the nullity of a contract for vices of consent cannot bar a second action for its resolution on the ground of nonperformance of the defendants' obligations." O'Quin I, *supra*, at 359.

Under these principles of French law, the present suit would not be barred by a previous decision in which the constitutional issues raised here were not decided either expressly or by necessary implication.[4] That discovery alone can-

---

1. Article 1351 reads: "L'autorité de la chose jugée n'a lieu qu'à l'égard de ce qui a fait l'objet du jugement. Il faut que la chose demandée soit la même; que la demande soit fondée sur la même cause; que la demande soit entre les mêmes parties, et formée par elles et contre elles en la même qualité. This article was borrowed from Pothier, who in turn took it from the Roman jurisconsults. O'Quin, Res Judicata— "Matters Which Might Have Been Pleaded," 2 La.L.Rev. 347 (1940), hereinafter referred to O'Quin I.

2. "Cause" would be a better translation than "cause of action." For an extended discussion of the meaning of "cause," *see* O'Quin I, *supra. Compare,* New Orleans Fire Assoc. Local 632 v. City of N. O., 263 La. 649, 269 So.2d 194, 199, n. 3 (1972).

3. Such as a suit for redhibition, which bars a subsequent suit for dimunition of price.

This problem is covered in Louisiana by Civil Code Art. 2543. O'Quin I, at 360.

4. "The authority of the thing adjudged attaches only to the *dispositif* (the actual decision), and not to the *motifs* (reasons for the decision); and it applies only to those parts of the *dispositif* as have actually been submitted to a court by the parties, and decided by the judgment. Hence a judgment granting alimony to a plaintiff, on the grounds that he is the defendant's child, does not conclude the question of the plaintiff's filiation unless this issue was raised and actually litigated by the parties. To determine this, the *dispositif* is interpreted by reference to the pleadings in the case. Whenever the application of res judicata is doubtful, the exception should be rejected." O'Quin I at 363 and commentators cited in notes 79–84 therein.

not decide this case, however, since Louisiana's unique jurisprudence, a tree with common law branches nourished and supported by civil law roots, often assumes shapes markedly different from any purely civilian species.

In fact, for over a century,[5] the history of Article 2286 was largely one of confusion resulting from the not always compatible contact between two methods of legal thought in Louisiana. Two conflicting but interspersed lines of cases arose, about equal in number, one decided in accordance with the Code and principles of French law, and the other influenced by the common law of other states in which "there were holdings or dicta contrary to the civil law principles of the authority of the thing adjudged." O'Quin, Res Judicata—"Matters Which Might Have Been Pleaded," 2 La.L.Rev. 491, 497 n. 27, 504 n. 56, hereinafter referred to as O'Quin II.

The Louisiana Supreme Court faced this conflict squarely for the first time [6] in Succession of Marinoni, 183 La. 776, 164 So. 797 (1935). *Marinoni* was the plaintiff's second suit to gain possession of a share of her father's estate. In the first suit, she alleged that her mother and Marinoni contracted a legal common law marriage in Mississippi and that she was a legitimate child of that marriage and, therefore, a forced heir. The first suit was dismissed for failure to state a claim. In the second suit, the plaintiff claimed a right to her share as the issue of a putative marriage contracted by her mother with Marinoni in good faith and in the belief she was legally married. The supreme court at first upheld the dismissal of the second suit stating that:

> "The rule is that where one claims a certain thing or seeks recognition of certain rights, he must assert all his pretensions, all his titles, in one suit. A plea of res adjudicata based on a former judgment between the parties on the same subject-matter bars a second suit for the same purpose, not only as to the titles specifically set up in the former suit, but as to those which might have been pleaded as well. A plaintiff cannot withhold grounds for relief which he should have asserted and then, when he loses, file another suit setting forth the facts originally alleged and those withheld." *Marinoni, supra,* at 799–800.

On rehearing, however, the court reversed itself, over three dissents, and specifically cited the above language as "too broadly stated, and . . . not in harmony with the latest decisions of this court on this point." *Marinoni, supra,* at 802. The court, although acknowledging the existence of contrary authority, decided to rely on that line of cases standing for the principles that "The doctrine of the common-law courts that res judicata includes not only everything pleaded in a cause, but even that which might have been pleaded, does not obtain generally under our system," Tennent v. Caffery, 163 La. 976, 990, 113 So. 167, 172 (1927); Woodcock v. Baldwin, 110 La. 270, 275, 34 So. 440, 441 (1902); and that "In this state the doctrine of res judicata is much more restricted than it is in common law states." State v. City of New Orleans, 169 La. 365, 374, 125 So. 273, 276 (1929), citing Woodcock v. Baldwin, *supra,* and State v. American Sugar Refining Co., 108 La. 603, 32 So. 965 (1902).

Applying the principles of Art. 2286, the *Marinoni* court noted that "It requires no great argument to prove that one claiming rights under a putative marriage is invoking a different cause of action than one who claims rights under a legal marriage." *Marinoni, supra,* 164 So. at 801.

Five years after *Marinoni,* in Hope v. Madison, 194 La. 337, 193 So. 666 (1940), the court, while reaffirming French principles behind the Louisiana law of *res adjudicata,* attempted to rec-

---

5. Article 2286 of the Code of 1870 is taken from the earlier Codes of 1825 and 1808.

6. O'Quin II at 507.

oncile previous jurisprudence on the subject. The plaintiff, Mrs. Hope, was involved in litigation over real property. While suit was pending, she transferred the mineral rights to the land in question to one of her attorneys of record. In her first suit to set aside the deed of mineral rights, she claimed lack of consideration, misrepresentation and fraud. After losing on the merits, she instituted a second suit to nullify the instrument as a prohibited purchase of a litigious right by an attorney. The issue in the second case, although not pleaded in the first suit, had been argued both in a supplemental brief filed after the case had been argued and submitted to the trial court, and later before the Louisiana Supreme Court. That court dismissed the issue with a statement substantially the same as the one with which the constitutional issues were dismissed in the first Maher case.[7]

In the second *Madison* case, the Louisiana Supreme Court held that *res adjudicata* was not applicable to the case.[8] The court reaffirmed the language of an earlier case which firmly held the Louisiana law of *res adjudicata* bound by the limits of the three unities of parties, object and cause (of action) established by the French law. State v. American Sugar Refining Company, 108 La. 603, 32 So. 965 (1902). Moreover, the court, after citing the French commentator, Planiol, for the proposition that courts must state precisely what they have decided in order to know what may still be litigated,[9] stressed the point by emphatically adopting the following language from an early Louisiana case:

"An issue presented by the pleadings in a cause, but eliminated from the judgment of the Court, cannot be invoked in support of the plea of res adjudicata . . . . The issue involving the nullity of Gill's title was tendered by the plaintiff in the rule, who urged the nullity of his purchase of a litigious right under the prohibition of Art. 2447 Civil Code, but the issue was declined by him and, on his objection, *it was specially excluded by ᴜs as an issue in the cause. Hence it was not passed upon and therefore it was not a thing adjudged.*" (Italics supplied by the Madison court.) *Madison, supra,* at 669, citing Buck & Beauchamp v. Blair & Buck, 36 La. Ann. 16 (1884).

The court, in *Madison,* briefly reconciled earlier cases with its holding by declaring that

"A review of the decisions cited by counsel for defendant in support of their contention reveals that they are authority only for the following rules: (1) That generally a breach of contract or single tort gives rise to but one cause of action, which cannot be divided and made the subject of several suits, and if one suit is brought for a part of the claim, a judgment thereon may be pleaded in bar to a recovery for another portion of the claim in a second suit (Norton v. Crescent City Ice Manufacturing Company, 178 La. 135, 150 So. 855; P. Olivier & Sons v.

7. "Courts can grant no relief for causes not complained of, and for that reason we shall not discuss or decide this point." Hope v. Madison, 192 La. 593, 188 So. 711, 715 (1939).

8. The dismissal of the case was affirmed, however, on the grounds that the purchase of the litigious right was allowable as a payment for legal services rendered.

9. 2 M. Planiol, Traite Elementaire de Droit Civil No. 54A(3) (11th ed. 1939). The court's translation reads, "In order to have the authority of the thing adjudged respected, the law places at the disposal of parties affected a special exception which is the ancient 'exceptio rei judicatae' of the Romans. *But the law ordains that this exception must not serve to paralyze actions distinct from the first which should remain independent of it, and it ordains them to state precisely in an exact manner that which has actually been judged the first time, in order to know that which may again be litigated.*" (Italics the court's) The Louisiana State Law Institute translation is less cumbersome, but to the same effect, i. e., ". . . what was really decided in the first case should be defined in an exact manner, in order that it may be known what questions may still be adjudicated."

Board of Commissioners of Lake Charles, 181 La. 802, 160 So. 419); (2) that in seeking injunctive relief, a litigant must set out all grounds or reasons therefor which existed at the time of his application (McMicken v. Morgan, 9 La.Ann. 208; Trescott v. Lewis, 12 La.Ann. 197; Porter v. Morere, 30 La.Ann. 230; Brooks v. Magee, 126 La. 388, 52 So. 551; Schwartz v. Siekmann, 136 La. 177, 66 So. 770; Givens v. Arcadia Cotton Oil and Mfg. Co., La.App., 175 So. 91); and (3) that parties litigant in a *petitory action*, whether plaintiff or defendant, must set up whatever title or defense they may have at their command or a judgment on that issue will bar a second action based on a right or claim which existed at the time of the first suit, even though omitted therefrom. Gajan v. Patout & Burguieres, 135 La. 156, 65 So. 17; Succession of Whitner, 165 La. 769, 116 So. 180."

After *Madison*, the landmark case on the effect of *res judicata* in Louisiana was Quarles v. Lewis, 226 La. 76, 75 So. 2d 14 (1954). The plaintiff had agreed to sell the defendant a parcel of ground. When the defendant failed to comply with the contract in the specified time period, the plaintiff sued for specific performance, and won. After defendant complied with the decree, the plaintiff sued again, this time for damages.[10] The Louisiana Supreme Court overruled the exception of *res adjudicata* on the grounds that the things demanded, specific performance and damages, were not the same, and in doing so reaffirmed the principles established in *Marinoni* and *Madison*. The court listed only four exceptions to the principle that there must be an identity of demands, parties and causes of action: 1) suits for partition of real estate; 2) petitory actions; 3) suits for an injunction against the execution of a judgment or of a writ of seizure and sale in executory process; and

4) where the prior litigation was determined on questions of fact and the thing demanded in the second suit is not identical only with relation to time of accrual.

The *Quarles* court noted, however, that some earlier cases which were dismissed by a mistaken application of the common law doctrine of *res judicata* may nevertheless have been correctly disposed of, if for the wrong reason, and was therefore careful to limit its holding to the issue of *res judicata* without comment on the ultimate viability of Mr. Quarles' suit in the face of "an exception of no cause of action or one of judicial estoppel . . . sustained on the theory that [plaintiff] would be considered as waiving all claims for damages which had not been asserted in [his] first suit." *Quarles, supra,* 75 So.2d at 17.

The court cited two cases as examples of its thinking. In Norton v. Crescent City Ice Mfg. Co., 178 La. 150, 150 So. 859 (1933), the court held that a single cause of action in tort was not divisible and that plaintiffs could not claim their transmitted damages from a deceased parent in one suit and sue for their direct loss resulting from the deaths of their parents in another case. P. Olivier & Sons v. Board of Com'rs, 181 La. 802, 160 So. 419 (1935), stands for the proposition that all breaches of one construction contract constitute but one cause of action.

Both of the examples which *Quarles* classifies as exceptions for "no cause of action" or for "judicial estoppel," it will be noted, are the same cases cited by *Madison* as the first exception to the unities requirement of Art. 2286. It would be difficult, therefore, to read this "judicial estoppel" exception as standing for more than the proposition that a single tort or breach of contract gives rise to only one cause of action. *See, Madison, supra.*[11]

---

10. The damages consisted of taxes paid on the property and interest on the purchase price during the period after default on the contract.

11. There is another meaning attached to the term "judicial estoppel" in Louisiana, but it concerns only *issue* preclusion, i. e., "every material allegation or statement made on

The principles established in *Quarles* remain the law of Louisiana,[12] although disagreements have developed as to the existence of identity of cause and object in specific circumstances, such as a will contest in which both suits allege the invalidity of the same will for an "inexact" date but for different reasons, Succession of Reynolds, 231 La. 410, 91 So.2d 584 (1956), or a concursus proceeding involving the right to oil royalties, California Co. v. Price, La. App., 99 So.2d 743 (1957). *See,* New Orleans Firefighters Assoc. Local 632 v. City of N. O., 263 La. 649, 269 So.2d 194 (1972) especially notes 1, 2, 3 at 198–199. *See also,* Bordelon v. Landry, 278 So.2d 173 (La.App.1973).

The case at bar, it seems clear, is not included in any of the exceptions to the strict requirement of the three unities of Art. 2286. It is not a petitory action, nor an action for partition, nor an action to enjoin enforcement of a judgment or executory process.[13] It does not concern a breach of contract or a single tort. Since the Louisiana Supreme Court expressly excluded the constitutional issue in this case from consideration, there can be no question but that this action is founded on a different cause than the earlier *Maher* case, and is therefore not barred from either state or federal court by "the authority of the thing adjudged" under Louisiana law, *Madison, supra.*[14]

We can turn now to the merits of the case. To begin with, plaintiff contends that the general regulatory scheme embodied in the Vieux Carré ordinance is not properly within the ample circumference of the police power but can be accomplished only through the exercise of eminent domain with its attendant constitutional requirement of compensation. This argument is clearly without merit. The courts have repeatedly sustained the validity of architectural control ordinances as police power regulation, especially when historic or touristic districts like the Vieux Carré are concerned. Santa Fe v. Gamble, Skogmo, Inc., 73 N.M. 410, 38 P.2d 13 (1964); Town of Deering ex rel. Bittenbender v. Tibbets, 104 N.H. 481, 202 A. 2d 232 (1964); Reid v. Architectural Board of Review, 119 Ohio App. 67, 192 N.E.2d 74 (1963); Opinion of Justices, 103 N.H. 268, 169 A.2d 762 (1961); Sunad, Inc. v. City of Sarasota, 122 So. 2d 611 (Fla.1960); State ex rel. Saveland Park Holding Corp. v. Wieland, 269 Wis. 262, 69 N.W.2d 217, cert. den. 350 U.S. 841, 76 S.Ct. 81, 100 L.Ed. 750 (1955); Opinion of the Justices, 333 Mass. 773, 182 N.E. 557 (1955); New Orleans v. Levy, 223 La. 14, 64 So.2d 798 (1953).[15]

one side . . . and denied on the other which was determined in the course of the proceedings." California Co. v. Price, 234 La. 338, 99 So.2d 743 (1957). There is some question now whether this Louisiana adaptation of common law collateral estoppel is still viable, Bordelon v. Landry, 278 So.2d 173 (La.App.1973), but in any event it has no application to the case at bar.

12. *But see,* Quinette v. Delhommes, 165 So. 2d 900 (La.App.1964), which repeats the common law formula in a manner reminiscent of the pre-*Marinoni* cases.

13. Many older Louisiana cases, including *Madison*, contain dicta broad enough to include all injunction suits in this exception. O'Quin pointed out, in 1940, that all of the cases were examples of enjoining the execution of a judgment or executory process. O'Quin II at 512. *Quarles* cleared up any possible confusion as to the scope of this exception.

14. We see no reason to give more effect to the Louisiana judgment than it would have in the Louisiana courts. *See, generally,* Vestal, Res Judicata/Preclusion by Judgment: The Law Applied in Federal Courts, 66 Mich.L.Rev. 1723, 1738–39 (1968). *Cf.,* Gaines v. Hennen, 65 U.S. (24 How.) 553, 16 L.Ed. 770 (1860).

15. In fact, the trend in the law is in the direction of decreased reliance on commercial, historical and property values to sustain architectural regulation, and toward increased acceptance of the concept of purely aesthetic regulation. *See,* Note, Beyond the Eye of the Beholder: Aesthetics and Objectivity, 71 Mich.L.Rev. 1438 (1973); Comment, Architectural Control Justified on the Basis of Property Value Protection, 1971 Wash.U.L. Q. 118; Comment, Aesthetic Control of Land Use: A House Built Upon the Sand?, 59 Nw.U.L.Rev. 372 (1964); Comment, Zoning Aesthetics, and the First Amendment, 64 Colum.L.Rev. 81 (1964).

Next, plaintiff maintains that the Vieux Carré ordinance is unconstitutional as applied to his particular cottage. He bases this contention on three arguments: a) that the detriment on the individual landowner in this case outweighs the benefit conferred on the public by the regulation; b) that the application of the ordinance is confiscatory in that it prohibits any economically reasonable use of the property; and c) that the application of the ordinance to the Maher cottage bears no substantial relationship to the regulatory objectives of the ordinance nor, consequently, to the general welfare.

This Court need not do as plaintiff urges and attempt the task of weighing the harm suffered by Maher against the public benefits secured by the preservation of this cottage since we are convinced that this test is not the proper standard of review to apply to this case. This is not a case where a Landmarks Commission has "suddenly and without warning imposed a blanket prohibition against alterations or demolitions upon a single property owner" but is a zoning regulation, of long standing, encompassing a whole district. Trustees of Sailor's Snug Harbor v. Platt, 53 Misc.2d 933, 280 N.Y.S.2d 75, 78 (S.Ct.1967), rev'd on other grounds, 29 A.D.2d 376, 288 N.Y.S.2d 314 (1968). *See, also,* Costonis, The Chicago Plan: Incentive Zoning and the Preservation of Urban Landmarks, 85 Harv.L.Rev. 574, 583 n. 36, 602 n. 93 (1972). *Cf.,* Opinion of the Justices, 333 Mass. 773, 128 N.E.2d 557, 562 (1955). A zoning ordinance, as an exercise of the police power, will almost always "reduce the value of rights of some individuals," but that does not make it unconstitutional. Neef v. City of Springfield, 380 Ill. 275, 282, 43 N.E. 2d 947, 951 (1942). Such a law becomes confiscatory and thus unconstitutional only when it "goes so far as to preclude the use of the property for any purpose for which it is reasonably adapted." Summers v. City of Glen Cove, 17 N.Y. 2d 307, 270 N.Y.S.2d 611, 217 N.E.2d 663 (1966).

■ Plaintiff argues that the Vieux Carré ordinance has made his property practically unusable, thereby confiscating it under this test. The Court must disagree. The evidence indicates that although the plaintiff is now receiving only $40.00 per month rental from the cottage, paid by the Maher's maid, no effort has been made to rent the premises out to anyone else for the past eight years. In addition, none except negligible repairs have been done on the property since 1963. The only alternatives which the Mahers have ever considered to the present arrangement are 1) demolishing the cottage and building apartments or 2) connecting the cottage to the Maher home. No evidence has been presented to indicate why this cottage could not be rented as a single family residence or, with permissible remodeling, as two or more apartments. It is common knowledge, of which the Court takes notice, that the French Quarter is a popular residential area, commanding rents higher than those prevailing in other parts of the city. Furthermore, no evidence has indicated that it might be at all difficult to sell this property. Under these circumstances, plaintiff has wholly failed to carry his burden of proving that he has been deprived of any reasonable use or return from his property.

■ Plaintiff further challenges the permit denial on the basis of the proposition that if the regulation of a piece of property is found to have no reasonable relation to the purpose of the zoning law, the zoning classification is arbitrary and, hence, unconstitutional as applied. Sturdy Homes, Inc. v. Township of Redford, 30 Mich.App. 53, 186 N.W. 2d 43 (1971); Du Page v. Halkier, 1 Ill.2d 491, 115 N.E.2d 635 (1953). He urges that

"The cottage in question possesses no historical or architectural value; yet the avowed purpose of the Vieux Carré ordinance and its constitutional enabling article is to preserve buildings of historical and architectural value in order to enhance the economic

resources of the City. Accordingly, the Vieux Carré ordinance and the community needs on which it is based have no reasonable relationship to the restriction placed on the Maher property." Pretrial Brief for plaintiff, at 25.

The Vieux Carré ordinance, however, pursuant to its constitutional authorization, authorizes the regulation of *all* buildings in the French Quarter which front on a public street or alley. This power is conferred "for the public welfare in order that the quaint and distinctive character of the Vieux Carré section of the City of New Orleans may not be injuriously affected, and in order that the value to the community of those buildings having architectural and historical worth may not be impaired . . . ." La.Const. Art. XIV, § 22A.

An issue similar to this one was faced by the Louisiana Supreme Court in the landmark City of New Orleans v. Pergament, 198 La. 852, 5 So.2d 129 (1941). In *Pergament*, the owner of a filling station of modern design challenged the power of the ordinance to regulate the type of sign he might erect on his property. The court answered in memorable language.

"And there is nothing arbitrary or discriminating in forbidding the proprietor of a modern building, as well as the proprietor of one of the ancient landmarks, in the Vieux Carre to display an unusually large sign upon his premises. The purpose of the ordinance is not only to preserve the old buildings themselves, but to preserve the antiquity of the whole French and Spanish quarter, the tout ensemble, so to speak, by defending this relic against iconoclasm or vandalism. Preventing or prohibiting eyesores in such a locality is within the police power and within the scope of this municipal ordinance. The preservation of the Vieux Carre as it was originally is a benefit to the inhabitants of New Orleans generally, not only for the sentimental value of this show place but for its commercial value as well, because it attracts tourists and conventions to the city, and is in fact a justification for the slogan, America's most interesting city." *Pergament, supra,* at 5 So.2d 131.

The same considerations which prevailed in *Pergament* apply to the case at bar. The protection of the "quaint and distinctive character of the Vieux Carré" depends on more than the preservation of those buildings agreed to have great individual artistic or historical worth. Just as important is the preservation and protection of the setting or scene in which those comparatively few gems are situated. In the present case, considerable testimony supported the position that the Maher cottage had substantial architectural value as part of the Vieux Carré scene as well as some individual architectural merit.

The fact that this case concerns the denial of a demolition permit rather than the prohibition of a large sign does not serve to distinguish *Pergament* in plaintiff's favor. On the contrary, the demolition of a building which contributes to the French Quarter scene is likely to be just as harmful to the *tout ensemble* as the allowance of an overlarge sign. The purpose of the ordinance is as much to preserve existing beauty as to prevent the creation of eyesores.

Plaintiff argues, however, that since he planned to construct a Spanish style building in place of a Victorian cottage not greatly distinguishable from many others in the Quarter, his proposed alteration would contribute more to the Vieux Carré scene than the preservation of the cottage. Such a finding would have certainly been possible. Architects appearing for the plaintiff strongly supported his position. The fact that the city authorities did not ultimately agree, however, does not make their action arbitrary. There are considerations, consistent with the purpose of the Vieux Carré ordinance, which could cause the city to consider the existing cottage more likely to preserve the "quaint and distinctive character" of the Quarter.

Some architects thought that the existing juxtaposition of the cottage with its immediate neighbors created an aesthetically pleasing scene, itself worthy of preservation. In addition, a legitimate consideration of the future as well as the present effects of authorizing demolition of a building which had value as part of the scene, Gulf Oil Corp. v. Board of Appeals of Framingham, 355 Mass. 275, 244 N.E.2d 311 (1969), could easily lead to the conclusion that the potential effect of such demolition on a larger scale would warrant a refusal to set a precedent. Perhaps even more important, it must be remembered that the Vieux Carré is more than a museum of French and Spanish architectural styles but is a mixture of constructions unique to New Orleans, as well as a living residential and commercial neighborhood containing a lively potpourri of socioeconomic and personal lifestyles. In many cases, it could well be a disservice to the "charm and distinctive character" of the Vieux Carré to permit the demolition of existing buildings in order to create new replicas of the past.

 Lastly, plaintiff argues that the Vieux Carré ordinance unconstitutionally delegates legislative authority to the City Council and Vieux Carré Commission in that it fails to furnish adequate standards to guide them in making their determinations. Most decisions hold, however, that zoning standards need not be specific but may be broad, general standards "so long as they are capable of a reasonable application and are sufficient to limit and define the Board's discretionary powers." City of Santa Fe v. Gamble, Skogmo, Inc., 73 N.M. 410, 389 P.2d 13, 18 (1964), and cases cited therein. In this case, the meaning of a mandate to preserve the character of the Vieux Carré "takes clear meaning from the observable character of the district to which it applies," Town of Deering ex rel. Bittenbender, 105 N.H. 481, 202 A.2d 232 (1964). It is for this reason that the Vieux Carré Commission, realizing that the character and value of many separate buildings and scenes throughout the French Quarter were part of the standard limiting the Commission's discretion, sought out an independent expert study group to evaluate each building in relationship to the whole district. Indeed, it appears that this case has not been an example so much of a lack of standards as a disagreement as to whether the Maher cottage qualified for demolition under the applicable standards. In view of the whole record of this case, it is the opinion of the Court that since the City Council, rather than acting arbitrarily, merely resolved a fair, albeit heated, difference of opinion, the judgment of that zoning authority should be followed. Marquette Nat. Bank v. County of Cook, 24 Ill.2d 497, 182 N.E.2d 147 (1962). *See, also,* City of New Orleans v. Pergament, *supra.* Accordingly,

It is the order of the Court that judgment be entered for the defendants at plaintiff's cost.