The First Presbyterian Church of York, Pennsylvania, Appellant *v.* City Council of the City of York, Appellee.

Argued January 7, 1976, before President Judge Bowman and Judges Crumlish, Jr., Kramer, Wilkinson, Jr., Mencer, Rogers and Blatt.

*G. Thomas Miller,* with him *William M. Young, Jr., Judson E. Ruch* and *McNees, Wallace and Nurick,* for appellant.

*John W. Thompson, Jr.,* City Solicitor, for appellee.

*Lavere C. Senft,* for Historic York, Inc.

Opinion by Judge Rogers, June 15, 1976:

The First Presbyterian Church of York, Pennsylvania, has appealed from an order of the Court of Common Pleas of York County sustaining the action of the Council of the City of York refusing to certify

the appropriateness of, and the consequent refusal by the City building inspector of a permit for, the demolition of a structure on the Church's grounds.

So far as we are aware, this is the first case occasioned by the Act of June 13, 1961, P.L. 282, *as amended*, 53 P.S. §8001 et seq. Although the appellant raises no question as to that enactment's general validity, we believe that a brief description of its provisions would be helpful to an understanding of this litigation. Section 2 of the Act, 53 P.S. §8002, provides in full: ''For the purpose of protecting those historical areas within our great Commonwealth, which have a distinctive character recalling the rich architectural and historical heritage of Pennsylvania, and of making them a source of inspiration to our people by awakening interest in our historic past, and to promote the general welfare, education and culture of the communities in which these distinctive historical areas are located, all counties, cities, except cities of the first class, boroughs, incorporated towns and townships, are hereby authorized to create and define, by ordinance, a historic district or districts within the geographic limits of such political subdivisions. No such ordinance shall take effect until the Pennsylvania Historical and Museum Commission has been notified, in writing, of the ordinance and has certified, by resolution, to the historical significance of the district or districts within the limits defined in the ordinance, which resolution shall be transmitted to the executive authority of the political subdivision.''

Section 3, 53 P.S. §8003, authorizes the municipal governing body to appoint a Board of Historical Review of not less than five members, consisting of a registered architect, a licensed real estate broker, a building inspector, and the remaining members persons ''with knowledge of and interest in the preservation of historic districts.'' The function of the Board

is to "give counsel" to the governing body regarding the issuance of certificates. Section 4, 53 P.S. §8004, empowers the governing body to certify to the appropriateness of the erection, reconstruction, alteration, restoration, demolition or razing of any building within the historic district or districts and prohibits the issuance of a permit for such changes until such a certificate shall have been issued. The same section requires the governing body in its determination of whether the certificate should issue to consider the effect of the proposed change on the "general historic and architectural nature of the district", and with respect to the building to consider only exterior architectural features which can be seen from the street but in this regard also to take into account "the general design, arrangement, texture, material and color of the building or structure and the relation of such factors to similar features of buildings and structures in the district."

At a time not disclosed in the record, York City Council adopted an ordinance pursuant to the Act of 1961 creating and defining a historic district in the central part of the City. York House, the building which the appellant Church wishes to demolish, is located within this district. The lot containing about 15,000 square feet on which York House rests, and which adjoins the appellant's Church ediface, was acquired by the appellant from the Historical Society of York County in 1959.[1] York House itself was constructed as his residence by a wealthy citizen of York

---

[1] The lot seems (by a deed not of record) to have been conveyed either to the appellant or to another religious body in 1785 subject to a restriction of use to religious activities. Since the appellant used the house for other than religious purposes after 1959, its suggestion in argument here that it may not do so in the future is not impressive.

in about 1860. It is, as the York Historical Architectural Board of Review after hearings found, an exceptional specimen of Victorian Italian-Villa architecture, virtually unaltered, and representing the highest level of design, workmanship, materials, and aesthetic values of the time of its construction. It is the most important building in a city block of residences built both before and after 1860 providing an authentic view of an 1890's street, unspoiled by later architectural styles. York House is on the National Register of Historic Places of the Department of Interior and has been described in publications of the Pennsylvania Historical and Museum Commission as the finest Victorian house in the City of York. The appellant Church does not dispute that York House possesses these qualities and deserves these special honors.

It is here appropriate to note that the Church concedes not only the historical and architectural value of York House, but also the facial constitutional validity of the Act of June 13, 1961 and York City's ordinance adopted pursuant thereto. Its contention is that the City's refusal to permit it to demolish York House is, in the circumstances, confiscatory and a deprivation of its property rights without due process of law.

The Church's application for permission to demolish York House was made May 1, 1972. The York Board of Historical Architectural Review, after hearing, recommended refusal of the application and City Council followed the Board's recommendation. The Church appealed Council's action to the Court of Common Pleas of York County pursuant to the Local Agency Law, Act of December 2, 1968, P.L. 1133, 53 P.S. §11308. The lower court, by the late President Judge Atkins, remanded the record for further hearing and findings by the Board of Historical Architectural Review sufficient for the application of the test

of constitutionality provided by *Trustees of Sailors' Snug Harbor v. Platt,* 288 N.Y.S. 2d 314 (1968).

The test of *Trustees of Sailors' Snug Harbor v. Platt, supra,* referred to by Judge ATKINS and still proposed by the Church for application here, goes as follows: "The criterion for commercial property is where the continuance of the landmark prevents the owner from obtaining an adequate return. A comparable test for a charity would be where maintenance of the landmark either physically or financially prevents or seriously interferes with carrying out the charitable purpose. In this instance the answer would depend on the proper resolution of subsidiary questions, namely, whether the preservation of these buildings would seriously interfere with the use of the property, whether the buildings are capable of conversion to a useful purpose without excessive cost, or whether the cost of maintaining them without use would entail serious expenditure—all in the light of the purposes and resources of the petitioner."

Upon remand, the Board of Historical and Architectural Review conducted a further hearing at which the Church adduced evidence tending to show that the costs of renovating York House for use by the Church would be $29,900, that the cost of repairing fire damages sustained in a fire in 1972 would be an additional $17,000 (against a still unspent insurance recovery of $10,000) and that annual maintenance costs, including about $4500 for janitorial services would be about $12,500. Persons opposed to the demolition were able to demonstrate that the Church's annual budget was about $254,000, that the Church had provided little or no maintenance after it decided to raze the building for campus or parking use, that the Church had used a substantial portion of the lot on which York House is located for the construction of a new parish house and that the Church had refused offers by public

spirited persons or groups to purchase or make other arrangements to assume or share with the Church the burden of the restoration and maintenance of the structure.

The Board again recommended denial of the Church's application, City Council followed the Board's recommendation, the Church again appealed. The court below, by Judge SHADLE, again upheld Council's action and this appeal followed.

In the interval of time between the lower court's order of remand and the Church's second appeal, *Maher v. City of New Orleans,* 371 F. Supp. 653 (E.D. La. 1974), had been decided. Whereas in *Trustees of Sailors' Snug Harbor v. Platt, supra,* the requirement of the permit for demolition was one imposed with respect to individual properties designated as historic landmarks and was not one imposed on all properties within a district declared to have architectural or historic interest, the questioned local legislation requiring such a permit in *Maher v. City of New Orleans, supra,* as does that of York City here in question, defined an area or district in which every building was subject to its requirements. The Federal district court in *Maher* held the ordinance there in question to be a proper exercise of the police power because it advanced the desirable public end of preserving buildings in the historic *vieux carre* section of New Orleans; that the ordinance was a zoning regulation; and that the test of constitutionality to be applied to a particular property for which a demolition permit was refused was not that of whether the detriment to the individual landowner outweighed the benefit conferred on the public, but that of whether the ordinance went so far as to preclude the use of the property for any purpose for which it was reasonably adapted. The district court concluded that Maher, the landowner, had not proved that the refusal of his application

to demolish his victorian cottage and replace it with a spanish style house precluded the use of his property for any purpose for which it was reasonably adapted.

Shortly after the instant appeal was filed in the Commonwealth Court, the United States Court of Appeals filed its opinion on Maher's appeal from the district court's order. The circuit court affirmed, declaring with respect to the claim that the property in question was taken without just compensation that: "As the ordinance was applied to Maher, the denial of the permit to demolish and rebuild does not operate as a classic example of eminent domain, namely the taking of Maher's property for governmental use. Nor did Maher demonstrate to the satisfaction of the district court that a taking occurred because the ordinance so deminished the property value as to leave Maher, in effect, nothing. In particular, Maher did not show that the sale of the property was impracticable, that commercial rental could not provide a reasonable rate of return, or that other potential use of the property was foreclosed. To the extent that such is the theory underlying Maher's claim, it fails for lack of proof." *Maher v. City of New Orleans,* 516 F.2d 1051, 1066 (5th Cir. 1975).

Judge SHADLE in this case noted the factual dissimilarity between the single property designation of *Sailors' Snug Harbor v. Platt, supra,* and the area designation of *Maher v. City of New Orleans, supra,* and concluded that the *Maher* test was therefore applicable, although expressing his conviction that the Church had not met even the more stringent test of *Sailors' Snug Harbor v. Platt, supra.* We agree with Judge SHADLE that the test to be applied is that of whether the refusal of the permit to demolish went so far as to preclude the use of York House for any purpose for which it was reasonably adapted; and with

his conclusion that the Church, having failed to show that a sale of the property was impracticable, that commercial rental could not provide a reasonable return or that other potential uses of the property were foreclosed, had not carried its burden of proving a taking without just compensation. With regard to the facts, we agree with the lower court, that the evidence shows that "[t]he appellant has made no attempt to rent the premises since 1971, it has performed no maintenance or repairs since that time, it has not used ten thousand dollars of fire insurance proceeds to repair damage by an accidental fire in the meantime, and it has declined to consider any offer to purchase the premises or to enter into a cooperative arrangement with others to restore, maintain and use it"; and further that "[The Church] desires only to use the land occupied by the building for landscaping and parking purposes. . . . [T]he building is capable of conversion to a useful purpose without excessive cost. . . . [The Church] offered evidence merely that it had no desire to use it for religious purposes, but that it is incapable of such use."

Reverting to the test of *Maher v. City of New Orleans, supra,* applicable to district historic zoning, that the property owner must establish that the regulation precludes use of the property for any purpose for which it is reasonably adapted, pertinent reference may be made to familiar Pennsylvania cases employing substantially the same test to applications for use variances—that is, that such a variance must be granted if the property in question cannot be used or sold for any purpose permitted by the applicable zoning regulations but that it should be denied if the showing is merely that the property could be more gainfully used or sold for a purpose not allowed by such regulations. *Peirce v. Zoning Board of Adjustment,* 410 Pa. 262, 189 A.2d 138 (1963); *Crafton Borough*

*Appeal,* 409 Pa. 82, 185 A.2d 533 (1961) ; *Magrann v. Zoning Board of Adjustment,* 404 Pa. 198, 170 A.2d 553 (1961) ; *Lally Zoning Case,* 404 Pa. 174, 171 A.2d 161 (1961) ; *J. Richard Fretz, Inc. v. Hilltown Township Zoning Hearing Board,* 18 Pa. Commonwealth Ct. 471, 336 A.2d 464 (1975) ; *Marple Gardens v. Zoning Board of Adjustment,* 8 Pa. Commonwealth Ct. 436, 303 A.2d 239 (1973) ; *DiBello v. Zoning Board of Adjustment,* 4 Pa. Commonwealth Ct. 546, 287 A.2d 856 (1972).

Order affirmed.

---

CONCURRING OPINION BY JUDGE KRAMER:

I concur in the result because the Church failed to carry its burden of proving by substantial evidence that its property had been confiscated or that the use of its property had been unreasonably restricted so as to constitute a taking or application of its property for a public use. The Church failed to prove that the ordinance in question was unduly oppressive to it, or that it was inordinately burdensome, or that as a result of the application of the ordinance the value of its property was so diminished that for all practical purposes nothing of value remained. The Church did not prove that the denial of a permit to demolish York House precluded the Church from using that property for any purpose for which it was reasonably adapted. It is for these reasons that I concur.

Because of the importance of the constitutional issues which have been raised, I feel constrained to note my reservations concerning the result we have reached in this case. My reservations are made in full recognition of the constantly developing and broadened principles established by the federal judiciary under concepts of the police power. I have noted with interest the language of the Circuit Court in *Maher v. City of New Orleans,* 516 F.2d 1051, 1059 (5th Cir.

1975): ''Drawing on the rich and flexible police power, a legislature has the authority to respond to economic and cultural developments cast in a different mold, and to essay new solutions to new problems. . . . '[P]roblems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive.' '' As those police powers expand, especially through the use of zoning-type laws, we reach a point or line beyond which we cannot go without infringing upon private property owners' constitutional rights. When we have this conflict between two constitutional provisions, we must either reconcile those powers and rights or else amend the Constitution. I am reminded in this bicentennial year of the birth of our nation that our founding fathers and their contemporary patriots were as much interested in protecting citizens' private property rights against encroachments by government as they were in liberty itself. And so they made constitutional provisions against government taking private property for public use except through the stringent and restrictive governmental powers of eminent domain.

These very basic private property principles have been eroded during the past fifty years especially through, *inter alia*, the application of zoning laws and urban redevelopment laws. As zoning law developed, the courts held, in the interest of protecting the public health, welfare and safety, that a private property owner could not use or build on his property in certain ways. But under all the zoning laws and cases,

the private owner was always permitted the alternative of leaving the land as it was, or if he illegally built he was ordered to remove the offensive part. Under the urban renewal laws whole areas of municipalities were declared to be blighted and private property was taken, but under all of these laws, the owner was fully protected through condemnation proceedings.

It seems to me that with the advent of historical district statutes, such as those involved in this case, in opinions such as *Maher, supra, Gaebel v. Thornbury Township,* 8 Pa. Commonwealth Ct. 399, 303 A.2d 57 (1973), and in the decision in this case, the legislatures and courts are adding a new dimension which may do violence to constitutional private property rights, for now we hold that a private property owner must make his property available without compensation for public view. In effect, he must dedicate his property without compensation for public historical, aesthetic, educational, and museum purposes, which in reality are public uses. Under the provisions of the ordinance in question, the Church can permit the interior or rear portions of its property to rot or deteriorate in a burned condition in any manner it sees fit, but it can't touch that portion of its property viewable from the street without permission of the local governing body, which uses vague standards founded on aesthetics and historical values, two concepts upon which reasonable men can disagree. There are no state health or safety standards involved whatsoever, rather the standards are based solely upon the feelings or observations of people interested in protecting neighboring properties in the historical district in the name of public welfare. I am concerned that we have reached a constitutional precipice and that an advancement of even a fraction of an inch will result in excessive governmental encroachment upon private property rights.

I want to make it clear that I agree with and applaud the scheme to protect, restore, and maintain places of historic value, but if the public wants to use, take, or apply a private property for that public purpose, then the public should pay for that laudatory purpose through constitutional means, *e.g.*, eminent domain. In the past we have accomplished these purposes through parks and museums provided by public funds or the benevolence of private donors. Today we change that trend by our holding and instead provide for the establishment of public museums through restrictions on private property owners' rights. The very thought that the next step may be a governmental regulation that all buildings in York's historical district must be painted colonial blue is to me repugnant to the Constitution, and if anything like that should develop, perhaps that will be the place to draw the line.

Judges CRUMLISH, JR. and MENCER join in this concurring opinion.