LAFAYETTE PARK BAPTIST
CHURCH, a corporation,
Appellant,

v.

Alden SCOTT, Clarence Ax, Martin Beffa, Dennis Bahlinger, and Charles Baker, as members of and constituting the Board of Adjustment of the City of St. Louis, and Michael Werner, Acting Building Commissioner of the City of St. Louis, Respondents.

No. 37459.

Missouri Court of Appeals,
St. Louis District,
Division Four.

May 24, 1977.

Motion for Rehearing and/or Transfer
Denied July 21, 1977.

Albert E. Schoenbeck, Stephen M. Schoenbeck, St. Louis, for appellant.

Edward M. Peek, Associate City Counselor, P. J. Wunderlich, St. Louis, for respondents.

SMITH, Presiding Judge.

Appellant appeals from the denial by the trial court of a writ of certiorari to review the decision of the Board of Adjustment of the City of St. Louis denying appellant a permit to demolish a building located on appellant's real property. The property is located within the boundaries of the Lafayette Square Historic District created by a city ordinance.

The appellant is a church. In September 1973, it acquired the property in question at a foreclosure sale at which it was the only bidder. The subject property adjoins the church property and was acquired for conversion into a parking lot for use by church members attending services and meetings. The real estate contains a 2½ story building, denominated a "double entry town house." The structure contains six apart-

ments, all vacant for some period of time before the church purchased the property. It is in a serious state of disrepair, which will be discussed more fully later.

After acquiring the property, the church contracted to have the building demolished. The contractor applied for a wrecking permit, and in December 1973, the Landmarks and Urban Design Commission of the City recommended that the Building Commissioner deny the permit. This was the first actual knowledge the church had that the property was within the Historic District or the restrictions on demolition contained therein. Since, however, the ordinance was in effect from June 20, 1972, the church had constructive knowledge and its absence of actual knowledge is of no consequence.

In March 1974, the church was granted a hearing before the Landmarks and Urban Design Commission, and presented evidence in support of the demolition permit. The Commission again voted to deny the permit. The church then appealed to the Board of Adjustment of the City of St. Louis which held a hearing. Reference to the evidence at that hearing will be made later. On May 30, 1974, the Board entered its Findings of Fact, Conclusions of Law and Order, and sustained the action of the Building Commissioner in denying the permit.

Those portions of the Board findings pertinent to our decision are:

"8. The subject building is a double-entry townhouse, one of only two existing in the area. It was constructed at approximately the same time as the other buildings in the area and therefore is of significant historic and architectural value. Although the building is in an extreme state of deterioration, due to lack of maintenance and misuse in the past, there does not appear to be any significant structural weakness.

"9. Page 37 of the Lafayette Square Restoration Plan includes a paragraph on the subject of 'demolition of selected dilapidated buildings,' which states in pertinent part, '. . . vacant buildings whose structural conditions have degen-

erated beyond feasible limits for rehabilitation have been listed with the Building Commissioner's Office."

"Conclusions of Law and Order

"It is the Decision of the Board of Adjustment, based upon the competent and substantial evidence adduced, that the structure in question, although in need of extensive rehabilitation, has not degenerated structurally beyond the feasible limits for rehabilitation, in light of its historic and architectural significance . . ."

Appellant's writ of certiorari to the Circuit Court followed in due course, and after judgment upholding the Board this appeal followed.

We deal for the first time in this state with an historic district ordinance designed to protect the integrity and continue the existence of neighborhoods having a distinctive cultural or historic heritage. Appellant, possibly because of its own interest in preserving the neighborhood in which it is located, has eschewed a frontal attack upon the constitutionality of the ordinance, and has admitted the ordinance is within the constitutional, statutory and charter powers of the City. It limits its attack rather to a charge of unconstitutional application as to the particular property involved, misapplication by the Board of the standards established by the ordinance, refusal by the Board to determine whether a variance should be given for "practical difficulties or unnecessary hardships," and a lack of evidentiary support for the Board conclusion that the structure could be rehabilitated.

The Lafayette Square Historic District is the product of two ordinances. The first, 56100, effective February 14, 1972, established the procedure for establishing an historic district. The purpose of this ordinance was stated to be "to promote the safety, morals, and general welfare of the public, including specifically its educational and cultural welfare through: (1) The protection, enhancement, perpetuation and use of buildings, structures, parks, sites and items of natural and artificial phenomena

located within a district which imparts a distinctive aspect to the City of St. Louis by serving as a visible reminder of the historic, architectural and cultural heritage of the City, the State of Missouri and the Nation; . . . ."

The ordinance requires the preparation of a plan for development of the district and public hearings concerning the proposed district. The ordinance further provides that building permits, which includes demolition, shall be granted or refused only after review by the City Plan Commission and consideration and determination by the Landmarks and Urban Design Commission. Action by those bodies "shall be consistent with the standards set forth in the ordinance with development plan creating the subject Historic District."

Pursuant to this grant of authority, the Lafayette Square Historic District was created by ordinance 56247, effective June 30, 1972. After reciting the requisite findings of historic, architectural and cultural value of the Lafayette Square area the ordinance set out the legal description of the area and designated it an historic district. Section 2 of the ordinance set forth the standards to be applied within the district as follows:

"The proposed standards to be applied within the district including but not limited to facades, setbacks, height, scale, materials, color and texture, for all structures and the design details of all fences, streets and drives, street furniture, signs and landscape materials are set out in the 'Development Plan for the Lafayette Square Historic District' approved by the City Plan Commission April 17, 1972 . . . which is hereby adopted and incorporated herein by reference . . . ."

The "Development Plan" referred to in the ordinance is a 20 page document plus maps. It includes several pages of Proposed Use, Construction and Restoration standards. None of these deal with standards for demolition of structures within the District. However, the Development Plan in turn incorporates by reference sec-

tions of the "Lafayette Square Restoration Plan, St. Louis City Plan Commission, Fall 1971."[1] That plan contains three provisions which could logically be considered to bear upon the church's request to demolish. Those are:

1. "Existing structures are to be removed only when their conditions are judged to be beyond rehabilitation or to accommodate important elements of the neighborhood plan. Extreme efforts must be taken to retain the existing structures, maintain continuity and preserve the streetscape."

2. "Property between the homes along Lafayette and Interstate 44 is the only place where new multi-family construction would be appropriate. Combined with adequate parking and open space, it could form a transitional buffer between the highway and the rest of the neighborhood." [The property in question is located in the area described.]

3. *"Demolition of Selected Dilapidated Buildings*
   "Dilapidated buildings have a major demoralizing effect on the neighborhood and are a safety hazard from the standpoint of fire, crime and injury to children. Vacant buildings whose structural conditions have degenerated beyond feasible limits for rehabilitation have been listed with the Building Commissioner's office. Every effort should be made to have them removed as soon as possible, under the City's demolition program. It is extremely important that other vacant structures not be allowed to further deteriorate or be demolished." [There is no evidence of record whether in fact such a list was filed in the Building Commissioner's office and if so whether the structure at issue was listed.].

It is apparent that the Board of Adjustment made a determination that the building had not deteriorated structurally to a

---

1. The church makes no attack upon the double reference technique used.

point where it was not feasible to rehabilitate it. Based upon the evidence and the Board's findings and order, it appears that this determination was based upon a finding of technological feasibility without regard to economic factors. As such it is contrary to the standards established if those standards are interpreted in a way to save them and the ordinance from unconstitutionality.

While no court decision in this state has dealt with an historic district ordinance we are not completely without guidelines. Decisions have been rendered from several other jurisdictions.[2] Additionally, such an ordinance is essentially a zoning ordinance and Missouri courts have frequently determined the validity and scope of those. It is important to note, however, one aspect of the historic district ordinance which makes it markedly more restrictive than the normal zoning ordinance. Under the usual ordinance, the use to which the property may be put is limited, but the landowner has a freedom within those limitations to erect the type of structure he desires subject to certain general guidelines. Under an historic district ordinance, the landowner is limited solely to the use he can make of the specific structure already located on the land. It is the essence of such ordinances that such structures are not to be removed or substantially altered in outward appearance.

The validity of a zoning ordinance is determined by whether the restriction imposed bears a substantial relation to the public health, safety, morals, or general welfare. *Flora Realty & Investment Co. v. City of Ladue*, 362 Mo. 1025, 246 S.W.2d 771, 778 (banc 1952) [2]; *Huttig v. City of Richmond Heights*, 372 S.W.2d 833, 839 (Mo.1963) [2]. Historic district ordinances frequently have several bases for enact-

ment. They serve to preserve culturally and historically important aspects of the life of the locality, state or nation. They sometimes serve to preserve areas which are tourist attractions to the economic benefit of the community. They also can serve an important public function in protecting and preserving definable neighborhoods threatened with urban blight. In so doing, they can provide viability and strength to the urban community as a whole. It is apparent from the record before us, that the primary purpose of the Lafayette Square Historic District ordinance was the preservation and protection of a neighborhood with a clearly identifiable history and culture, which was in imminent danger of decay, dilapidation and destruction. This ordinance was clearly in the best interests of the general welfare of the City of St. Louis.

However, " 'A zoning ordinance may be valid in its general aspects, and yet as to a particular state of facts involving a particular owner affected thereby may be as to such owner so clearly arbitrary and unreasonable as to be unenforceable.' " *Flora Realty & Investment Co. v. City of Ladue*, *supra* at 778[4, 5], quoting *Women's Kansas City St. Andrew Soc. v. Kansas City, Mo.*, 58 F.2d 593, 599 (8th Cir. 1932). *See also Huttig v. City of Richmond Heights*, *supra* at 838–39[2].

The burden of proving unreasonableness is upon the person challenging the reasonableness of the ordinance as it pertains to a specific property. *Tealin Company v. City of Ladue*, 541 S.W.2d 544, 548 (Mo. banc 1976); *Vatterott v. City of Florissant*, 462 S.W.2d 711, 713 (Mo.1971). Reduction in value of the property because of the ordinance does not alone establish unreasonableness. *Tealin Company v. City of*

---

2. *See, e. g., City of New Orleans v. Pergament*, 198 La. 852, 5 So.2d 129 (1941); *Maher v. City of New Orleans*, 371 F.Supp. 653 (D.C.La.1974) *aff'd*, 516 F.2d 1051 (5th Cir. 1975), *cert. denied*, 426 U.S. 905, 96 S.Ct. 2225, 48 L.Ed.2d 830 (1976); *Opinion of Justices to Senate*, 333 Mass. 773, 128 N.E.2d 557 (1955); *City of Santa Fe v. Gamble-Skogmo, Inc.*, 73 N.M. 410, 389 P.2d 13 (1964); *Town of Deering ex rel. Bittenbender v. Tibbetts*, 105 N.H. 481, 202 A.2d 232 (1964); *Penn Central Transportation Co. v. City of New York*, 50 A.D.2d 265, 377 N.Y.S.2d 20 (1975); *First Presbyterian Church of York v. City Council of York*, 25 Pa.Cmwlth. 154, 360 A.2d 257 (1976).

*Ladue, supra* at 549[1]; *Huttig v. City of Richmond Heights, supra* at 840[3]; *Flora Realty & Investment Co. v. City of Ladue, supra* at 779[8]. Yet economic considerations cannot be totally discounted. There are limits to the extent to which the owner of property may be compelled to bear the cost of improving the general welfare. It is certainly recognized that property may not be zoned so as to prevent any effective use, because such a regulation becomes an unlawful confiscation. *Herman Glick Realty Co. v. St. Louis County*, 545 S.W.2d 320, 324 (Mo.App.1976) [2]; *Huttig v. City of Richmond Heights, supra* at 841[3]; *First Presbyterian Church of York v. City Council of York*, 25 Pa.Cmwlth. 154, 360 A.2d 257, 261 (1976) [1, 2]; *Maher v. City of New Orleans*, 516 F.2d 1051, 1065 (5th Cir. 1975) [20]; *Fred F. French Inv. Co., Inc. v. City of New York*, 39 N.Y.2d 587, 385 N.Y.S.2d 5, 10–11, 350 N.E.2d 381, 386–387 (1976) [8]. If the general welfare demands that property be subjected to a burden of no effective use, then the City and the public must bear that burden through condemnation.

■ In view of these principles it is necessary that the standards established governing demolition in an historic district take into account the economic impact upon a given parcel where demolition is sought. It is not necessary that the standards be unduly rigid or specific, "so long as they are capable of a reasonable application and are sufficient to limit and define the Board's discretionary powers." *City of Santa Fe v. Gamble-Skogmo, Inc.*, 73 N.M. 410, 389 P.2d 13, 18 (1964) [10, 11]. And these standards may achieve certain of their meaning from the observable character of the district to which they apply. *Maher v. City of New Orleans*, 371 F.Supp. 653, 664 (D.C.La.1974) [7]. The Development Plan and the Restoration Plan for Lafayette Square set out in considerable detail the general, and in some cases, specific guidelines and standards to be applied by the board in passing upon building permit requests.

■ As to demolition, we have heretofore set forth the language of the Restoration Plan pertaining to that subject matter. As it pertains to this case, it provides that structures are to be removed "only when their conditions are judged to be beyond rehabilitation." It is further stated that the area in which the subject property is located is a place where new multi-family construction would be authorized and such construction should be combined with adequate parking and open space. In addition, the Restoration Plan specifically declares that dilapidated buildings are a demoralizing influence constituting a safety hazard from fire, crime, or injury to children. While the statement goes on to say that vacant buildings whose structural condition has deteriorated beyond feasible limits for rehabilitation have been identified, no evidence that such identification listing was before the board is contained in the record. It is also obvious that such a statement in the Restoration Plan cannot serve to preclude demolition of buildings which achieve the requisite state of structural decay after the preparation of such initial list. The standards of the Plan clearly call for demolition of vacant, dilapidated buildings which constitute a fire, safety or crime hazard, regardless of when that condition is reached.

■ From what we have heretofore said it is also apparent that for the standards to meet constitutional objections, they must be interpreted to authorize demolition when the condition of the structure is such that the economics of restoration preclude the landowner from making any reasonable economic use of the property. The decision of the City authorities cannot be based simply upon a determination that it is physically possible to save the structure at an expense unwarranted by the possible use which could be made of such structure after rehabilitation. Such a determination would place upon the landowner the obligation to expend his money, not for his benefit, but for that of the public, or alternatively to forego any use of the land for the foreseeable future. Neither alternative can be compelled under the police power of the State in the absence of condemnation.

We turn to the evidence elicited at the hearing. The only evidence of the cost of rehabilitation is that it would exceed $50,-000. The only evidence was that this cost was economically unwarranted for the end product which would result. The only specific evidence of the condition of the structure was presented by Mr. Leon Spotswood, a structural engineer and architect. He testified that due to neglect of previous owners, the building is in unsafe condition and should be condemned before someone is hurt. The front wall should be replaced entirely, the back stairs are rotten and dangerous and should be replaced, the roof is decaying and should be removed, some rafters are decaying from leakage through the roof, some weight bearing walls are bulging, some floor joists are deteriorating, all windows should be replaced, all doors should be replaced, brickwork needs tuckpointing, cornices and stone window sills are broken away, walls are cracked, some bricks have fallen out of an outside wall, guttering and downspouts have or are falling off the building, all electrical fixtures and sockets have been removed, wiring is in bad shape, there is no plumbing or plumbing fixtures, fireplaces have been removed, basement floor is cracked, all wood surfaces need painting, the walls, ceilings, floors, doors and windows are in "horrible condition," floorboards are missing, and doors are missing. He did state the foundation was in "pretty good shape."

There was testimony by an architect who is the chairman of the Landmarks and Urban Design Commission of the City that the building is architecturally significant. He also disputed that the building was structurally unsound because he saw no evidence of "structural or brick bearing wall deficiency that would indicate the building is about to fall on its own accord." He admitted the best judge of structural soundness is an engineer and he did not state whether he had actually examined the building or only photographs of it.

The remaining evidence dealt either with the activities of the church and its needs, or the efforts and activities of residents of the area to rehabilitate other structures in the district and their desire that demolition of the structure not be allowed because of the effect upon the district as a whole. This is a legitimate consideration, *Maher v. City of New Orleans (both cases), supra,* but cannot serve as the sole basis for refusing demolition. The voluntary actions of these landowners does not warrant imposing similar conduct on another landowner or precluding his effective use of his property.

We find that the Board applied an improper standard in determining whether a demolition permit should be granted by considering only technological feasibility and not economic feasibility. Whether factually the structure meets the proper standard for demolition is a decision for the Board for which we may not substitute our judgment. It is therefore necessary for us to remand this case to the Board for its determination under the proper standards.

This disposition makes it unnecessary for us to rule the church's remaining contentions. We must, however, note those contentions and their applicability to further proceedings. It is possible that a factual determination that the building does not qualify for demolition under the standards of the district as a whole could be made. Such a finding might still place the individual owner in a position where as to him and his property the application of the standards is unreasonable and contrary to his constitutional rights. Relief from such a situation can be given under the general hardship provision of the zoning laws. If not, a landowner may still seek a determination that the ordinance is unconstitutional as to him because it unreasonably restricts his use of the property beyond permissible limits. In historic district cases the courts have required the landowner to establish that not only can he not economically utilize the property, but that it is impractical to sell or lease it, or that no market exists for it at a reasonable price. *See Maher v. City of New Orleans (both cases), supra,* 371 F.Supp. at 662[4, 5] and 516 F.2d

at 1066[22, 23]; *First Presbyterian Church of York v. City Council of York, supra* at 260. The latter test would appear to require proof that no purchaser can be obtained willing to pay the value to the landowner of the land after demolition minus the cost of demolition. Where a landowner is unable because of his own financial status to rehabilitate the property even within reasonable economic limits and is unable to dispose of the property at a reasonable price, enforcement of the ordinance would practically serve to confiscate his land. Since, however, the public welfare sought to be protected by historic district ordinances could, of course, be accomplished by condemnation, the landowner is protected if he is able to sell the property for its reasonable value without regard to the nondemolition features of the ordinance.

Since we have ruled that the Board failed to apply the proper standard, it is unnecessary to rule or comment on the church's contention that even under the standard applied by the Board the finding was contrary to the evidence.

We are sympathetic with the serious problems of neighborhood deterioration and blight common in our large urban communities. We are also sympathetic with and commend the efforts of responsible landowners to prevent such deterioration and blight through neighborhood associations devoted to improvement, rehabilitation and preservation of these neighborhoods. We also recognize the sincere efforts of urban leaders and elected officials to provide legal methods for such preservation. We further believe courts must be responsive to these efforts and within the framework of the law support such efforts albeit the approach is novel or innovative. But neither the courts nor the governmental entities involved should ignore the warning issued by Mr. Justice Oliver Wendell Holmes in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922):

"We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

The cause is reversed with directions to the trial court to remand the cause to the Board of Adjustment for further proceedings consistent with this opinion.

NORWIN D. HOUSER and ALDEN A. STOCKARD, Special Judges, concur.