## Cleckner v. Harrisburg

*Thomas I. Myers*, for appellant.
*Nathan H. Waters, Jr.*, for respondent.

CALDWELL, *J.*, June 25, 1979—This is an appeal from a decision of the City Council of Harrisburg denying appellant a permit to demolish two vacant houses located at 125 and 127 Pine Street. The houses were originally purchased by appellant and his brother, one in 1950, the other in 1956, with appellant acquiring the full interest in both properties in 1975.

In 1974, the City of Harrisburg, pursuant to enabling legislation, created by ordinance the Historic District of Harrisburg.[1] Appellant's properties are located within the Historic District and had been in a state of decay since before the adoption of

---

1. Article 1351.02 of the Codified Ordinances of the City of Harrisburg, enacted pursuant to the Act of June 13, 1961, P.L. 282, sec. 2, 53 P.S. §8002.

the Historic District ordinance. On December 5, 1975, appellant applied for a permit to demolish the buildings and thereafter received an order from the city to either tear down the structure at 127 Pine Street or repair it so as to bring it into conformity with safety regulations.

The application for the demolition of the structures was initially considered by the Board of Historical Architectural Review of the City of Harrisburg on December 15, 1975. On March 1, 1976, the board recommended to the Harrisburg City Council that a demolition permit be denied and city council concurred. The appellant appealed this decision to this court and the case was remanded for reconsideration. Additional testimony was taken, and the Board of Historical Architectural Review again recommended that the demolition permit not issue. The city council again concurred, and Mr. Cleckner again appealed.

This appeal is under the recently enacted Local Agency Law, which provides for review where, as here, a complete record has been made:

"After hearing the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law . . . or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence . . . " 2 Pa.C.S.A §754(b) [See Purdon's Pa. Legislative Service, No. 3-1978, page 183.]

Appellant's central argument is that the denial of the demolition permit constitutes an unconstitutional "taking" of his property. The argument would appear to have two facets: one being con-

cerned with history and aesthetics, the other with economics.

## A. HISTORIC/AESTHETIC

The testimony concerning the historic and aesthetic significance of the properties is conflicting. Martin L. Murray, an architect, testified for appellant that the buildings had no architectural significance. Further, he pointed out that there was no consistent scale, architectural character, or historic nature on the Pine Street block to which the buildings could relate. In a similar vein, Mr. Evan J. Miller, a local real estate broker and a recognized local historian, testified for appellant that the two properties were of no particular historic interest or significance.

On the other hand, there was testimony to the effect that the two buildings were both architecturally noteworthy and historically valuable. For example, Mr. Duryea Cameron, a Harrisburg architect, testified for the city that 125 Pine Street was "a miniature McCormick mansion" and "a unique Victorian structure in Harrisburg." He testified that both structures were "very much a part of the fabric of the historic district." Similarly, Mr. John Wick Havens, Jr. testified on behalf of the Historic Harrisburg Association that the properties were, in the opinion of the association, "architecturally significant" and "essential to retaining the general historic character and nature of their neighborhood."

Thus, it appears that there was evidence to support a finding that the two buildings were historically significant. It may be argued that the buildings have no compelling individual characteristics,

but even if this were true it would not be determinative. An historic district is described by the National Register of Historic Places as:

"[A] geographically definable area, urban or rural, possessing a significant concentration, linkage, or continuity of sites, buildings, structures, or objects which are united by past events or aesthetically by plan or physical development. A district also may be comprised of individual elements which are separated geographically but are linked by association or history." National Register of Historic Places, How to Complete Register Forms 8 (1975).

When considering "historic district" matters the emphasis is on linkage among buildings in the entire district, not, as in landmark legislation, on the individual significance of a particular structure. The buildings at 125 and 127 Pine Street are, at the least, typical nineteenth century structures, and are thus linked historically to other nineteenth century structures in the district. It has been pointed out by appellant that the block of Pine Street on which the buildings are located also contain several modern structures, and it is argued that the buildings referred to are thus out of place. Apart from the fact that there are contiguous historic houses on Pine Street, the suggested frame of reference is too narrow, and the review board properly considered more than simply the impact of a proposed demolition on a single block:

"Any governing body in determining whether or not to certify to the appropriateness of the erection, reconstruction, alteration, restoration, demolition or razing of a building, in whole or in part, shall

consider the effect which the proposed change will have upon the general historic and architectural nature of the district. . . . " 53 P.S. §8004(b).

On balance we conclude that the Board of Historical Architectural Review could reasonably find the demolition of appellant's buildings detrimental to the preservation of the fabric of the historic district in which they are situate.

Historic district legislation is a subject bound to arouse divergent emotion. The public perceives a valid interest in preserving the past, while the owner of real estate is aggrieved by his inability to deal with his property as he sees fit. The balancing of these conflicting interests will usually prove to be a delicate problem and this case is no exception. Depending upon how one views the evidence the scales could swing in either direction. In this case the board's findings of fact are supported by testimony and evidence in the record.

While the witnesses for the contesting parties were in sharp disagreement as to the architectural and historical significance of the buildings involved, there is no basis for our concluding that the board committed an abuse of discretion in relying on appellee's evidence. Our proper function is only to insure that there is substantial support for the board's conclusions in the record, and we may not substitute our judgment for theirs. The board chose to accept the testimony of appellee's witnesses and we are not at liberty to dictate that appellant's version is correct or more reasonable. Given the constitutional validity of the ordinance, the board's decision must be upheld in this instance.

## B. ECONOMIC

The second prong of the appellant's constitu-

tional attack focuses on economic considerations—that is, the alleged "taking" of appellant's property. Again, the testimony is in conflict. It is not disputed that it will cost a substantial sum of money to repair the properties so that they can be used as offices. For example, Mr. Charles Janaskic, the city's expert, estimated the cost of rehabilitation at $127, 502. By contrast, Mr. John Bordner, an expert for appellant who appears to have conducted the most detailed analysis, estimated the cost of repairs at $176,069—this figure excluding restoration of the third floor of both buildings. Mr. Murray's testimony indicates that his estimate for the repair costs for both buildings is largely in accord with Mr. Bordner's figure. Appellant contends that, with the excessive cost of restoring the buildings, it will be impossible for him to realize a reasonable return for his investment if he is forced to repair and rent them. The experts who testified disagree as to whether repair and rental is economically feasible. While we would agree with appellant that restoration and rental is not economically feasible, it is not established that the denial of the demolition permit amounts to a "taking" of the property. It has not been adequately demonstrated by appellant that a sale of the properties is impossible or impractical.

A Federal court in Maher v. City of New Orleans, 516 F. 2d 1051 (5th Cir. 1975), required, as proof of a taking, that a property owner show in effect that the historic district ordinance rendered his property valueless, and in particular that sale of the property was impracticable: Id. at 1066. From this we infer that no unconstitutional taking would occur if the property in the instant case could be sold by the appellant for its fair market value.

It is obvious that the best and most profitable use of the property from the appellant's point of view is

to remove the existing buildings and use the property for commercial parking, or for a more modern structure. Whether the appellant has been denied the "best use" of the property has not generally been considered the test of a "taking" in the context of historic district legislation in most jurisdictions. See Historic Zoning: The Test for an Unconstitutional Taking, 81 Dick. L. Rev. 136 (1976). Certainly this is not the test in Pennsylvania as shown by the case of The First Presbyterian Church of York, v. City Council of the City of York, 25 Pa. Commonwealth Ct. 154, 162, 360 A. 2d 257 (1976). The court in York applied a stringent test similar to that enunciated in Maher v. City of New Orleans, supra. The Maher court required, in effect, that the property owner show that the historic district ordinance deprived him of all reasonable use of his property, including the option of selling same. In York, the court applied equally vigorous standards, comparing the showing required to establish a "taking" under historic district legislation with that required for the grant of a use variance: "[S]uch a variance must be granted if the property in question cannot be used or sold for any purpose permitted by the applicable zoning regulations but that it should be denied if the showing is merely that the property could be more gainfully used or sold for a purpose not allowed by such regulations."

Testimony was presented as to the current value of the properties with the buildings in their present condition. Mr. Daylor, the city's expert, placed the value at $63,280 for both properties, while Mr. James Helsel, appellant's expert, placed the value of the property at $66,200.

Following the meeting of the review board on January 10, 1977, Mr. Cleckner was given the opportunity to test the market for his properties by

offering them for sale. The testimony concerning his attempts was presented at the board meeting of June 12, 1978. Appellant placed a sign on the properties advertising them as being for sale and giving his phone number. An advertisement was also placed in the Preservation News, a nationally published paper for those interested in historic buildings. Appellant's asking price was $125,000. Apparently, he received about one hundred phone inquiries concerning the properties, but only a few "serious" offers. Several tentative offers, one for $47,000 and another for $125,000 did not materialize. An offer for $30,000 or $40,000 Mr. Cleckner rejected, as he did an offer to participate in a joint enterprise ($125,000 with no down payment and no definite payment schedule). All of the above testimony concerning the sale is in the notes of testimony.

It can be fairly said that appellant did not proceed prudently in offering his properties for sale. He did not offer the properties for sale through a real estate broker, evidently did not advertise them in a local newspaper, and set an inflated asking price of $125,000. All of these factors in our judgment only served to guarantee that a sale would not be consummated based on the fair market value of the properties. As noted, if appellent were able to sell his properties for their fair market value, he could not consider them "taken" by operation of the Historic District Ordinance. Having failed thus far to adequately demonstrate that sale of the properties is impractical, appellant's appeal must fail.

## ORDER

And now, June 25, 1979, the within appeal is denied.