Alvin WEINBERG and Shirley
Weinberg, his wife

v.

CITY OF PITTSBURGH, HISTORIC
REVIEW COMMISSION,
Appellant.

Alvin WEINBERG and Shirley Weinberg,
his wife, Appellants,

v.

CITY OF PITTSBURGH, HISTORIC
REVIEW COMMISSION.

Commonwealth Court of Pennsylvania.

Argued Nov. 1, 1994.
Decided Dec. 19, 1994.

George R. Specter, for appellant City of Pittsburgh.

Sidney Baker, for appellees Weinberg.

Before SMITH and KELLEY, JJ., and RODGERS, Senior Judge.

RODGERS, Senior Judge.

This is an appeal by the City of Pittsburgh, Historic Review Commission (Commission) from a decision of the Court of Common Pleas of Allegheny County (trial court) which reversed a decision of the Commission refusing to grant to Alvin Weinberg and Shirley Weinberg, his wife (Weinberg), a certificate of appropriateness for demolition of a designated historic structure known as Gateway House. We affirm the trial court.

Gateway House, a large two and one-half story frame dwelling, located on Fifth Avenue at Woodland Road, was built around 1860 in Gothic Revival style and is the oldest surviving element of Fifth Avenue's "millionaire row". It was not a mansion, but a gatehouse to a mansion, later replaced by the Benedum mansion. The historic significance of Gateway House is unquestioned, but is limited to the exterior, because all items of historic interest have been removed from the interior. Gateway House was designated an historic structure in April 1986 by a resolution of City Council approved by the Mayor pursuant to a city ordinance governing designation and preservation of historic structures.

Chatham College owned and used the property as a dormitory until the 1980s, and then considered using it for faculty housing, but determined the cost of renovation was too great. Gateway House has been unoccupied since 1984. In June 1985, Chatham College sold Gateway House and adjoining property to Greystone Associates, Inc., developers of a townhouse project at this location.

The City Planning Commission approved the townhouse project provided, among other things, that the developer pursue the designation of Gateway House as an historic structure. Greystone pursued the designation, but did not renovate Gateway House, and listed it for sale without success until February, 1988, when Greystone sold Gateway House to Weinberg for $175,000 without a mortgage. Weinberg had previously agreed to purchase a townhouse from Greystone but, because of drainage problems at the site, desired to be released from that agreement. The developer was willing to release Weinberg if they agreed to purchase Gateway House for $175,000. In September 1986, Weinberg's son had purchased from Greystone an adjoining one-half acre lot for $188,000.

In 1989, Gateway House property was separately assessed by the City at $40,000 representing a fair market value of $160,000. Weinberg purchased Gateway House fully aware of the historic designation and the restrictions on renovations and demolition but, at the time of purchase, did not secure an estimate of the cost of renovation.

Weinberg initially intended to restore the dilapidated structure and use it for a residence. They obtained the Commission's permission to make exterior repairs and spent about $36,000. Their contractor indicated he could not guarantee the work because the house had serious structural problems. Weinberg decided to renovate the house for resale as a one or two family residence and applied for a mortgage. Pittsburgh National Bank denied the mortgage as a commercial loan because the cost of renovation would exceed the value of the renovated dwelling, but said it would consider a loan secured by other collateral.

The Weinbergs then sought a certificate from the Commission to demolish Gateway House. The Commission conducted a hearing of which no transcript was made, and

denied the application. Weinberg appealed, and the trial court remanded for the making of a record. A hearing was held by the Commission on June 7, 1991. At this hearing, Michael Eversmeyer, a staff member of the Commission, submitted his report and showed slides pointing out the historic significance of Gateway House, but introduced no evidence of the fair market value of Gateway House before or after renovation, nor any evidence of the cost of renovation.

A letter dated January 4, 1990, from Rebecca Stafford, President of Chatham College, introduced at the prior hearing, was made a part of the record. In this letter, Ms. Stafford, on behalf of the College, supported demolition of Gateway House because the structure was beyond restoration and presented an attraction to vagrants, vandals and rodents. However, at the hearing on June 7, 1991, a letter from counsel for Chatham College stated that, while it believed the property continued to be an attraction to vagrants, vandals and rodents, a danger to the health and safety of its neighbors, an eyesore which adversely affected the value of neighboring properties requiring prompt remedial action, the College also believed the property was a significant historic structure and would prefer that it be renovated; but if the cost of renovation was in excess of the value of the property after renovation, the College would support demolition.

The letter of another neighbor and the testimony of a representative of the Pittsburgh History and Landmarks Foundation opposing demolition of this historic structure were also made a part of the record.

Weinberg presented the testimony of Douglas Berryman, an architect, and Lee Goldblum, a realtor. Mr. Berryman testified that, while Gateway House was in poor condition, it was not so structurally unsound to be beyond restoration. The estimated cost of such renovation was $567,000. Garages would also have to be built; the estimated cost of building a two car garage for a single family residence was about $45,000 to $50,-000; the architect's fee would add an additional $35,000. Weinberg's total investment, including the initial purchase price of $175,-000 and $36,000 spent for initial repairs would, therefore, exceed $850,000. The estimated cost of erecting a new brick house on the site after demolition of Gateway House was between $570,000 and $600,000.

Mr. Goldblum, a realtor for Howard Hanna with twenty-three years experience testified that the renovated house could be marketed as two units for about $250,000 each and as a single family residence for about $500,000 to $550,000. He testified that a new home in that location would sell for about $800,000. Mr. Goldblum testified that Gateway House was on the market after 1985 and, although many people went through it, there was no real interest. He said there was little activity in purchases for renovation and not much of a market for restored homes, most likely because bank financing was not available. He guessed, when pressed, that Gateway House could possibly sell as is for about $250,000, but said there were no comparable sales upon which he could base an expert opinion. He remained of the opinion that the fair market value of Gateway House after renovation would not exceed $550,000, but when pressed conceded it was "possible" there might be someone willing to pay $800,-000.

The Commission met again on August 2, 1991, in the presence of their staff and counsel for Weinberg, to consider their decision. Mr. Eversmeyer read the staff recommendations to deny the application for demolition permit. Counsel for Weinberg then stated his objections to the proposed findings. Further discussion ensued among the members of the Commission pointing out that the Weinbergs had accepted the designation of the building as an historic structure and had failed to seek any estimates for rehabilitating the building prior to purchase. The Commission then voted to accept the findings and recommendation of its staff denying the application for demolition.

The Commission found that the demolition of Gateway House would destroy a structure of major historical and architectural significance in the city; that Gateway House was not structurally unsound; that the owners understood the restrictions imposed upon disposition of the structure by the historic designation. The Commission further found

renovation costs, not including purchase price and interim expenses, would be about $650,000 for a single family house with garage, and $700,000 for a two unit residence with two garages. The Commission opined the purchase price (of $175,000) should not be used as an element of the hardship argument "since a mistakenly high payment for the building was a matter under the control of the owners".

The Commission then found that Mr. Goldblum had testified that the property could be sold as is for between $200,000 and $300,000; as a renovated single unit for $500,000 to $550,000; and as a renovated two unit residence for $500,000; and possibly for as much as $800,000. The Commission found no economic hardship because, on the basis of Mr. Goldblum's testimony, the owners could recoup their investment by selling the property as is for $200,000 to $300,000; they could renovate the property for their home, an option where economic considerations were of secondary importance; they could renovate the building for sale as a single family house and might or might not recover their costs; or they could renovate the building as a two unit residence and sell, in which case they probably would not be able to recoup their costs.

The Commission concluded that the owners would not be deprived of all reasonable use of, or return on, their property because it had not been demonstrated that the property could not be used as a single family residence or that it could not be sold, and disapproved the application to demolish Gateway House "because the building has major historic and architectural significance and because there would not be an economic hardship imposed on the owners of the property by the denial of the application." (Commission's decision, p. 9.)

On appeal by the owners, the Weinbergs, the trial court reversed because the Commission had erred in concluding that Mr. Goldblum, the owner's real estate expert, had given equivocal testimony as to the fair market value of a fully renovated Gateway House, and in finding that Mr. Goldblum had testified Gateway House could be sold as is for $200,000 to $300,000.

■ The Commission, joined by the amici curiae, the National Trust for Historic Preservation in the United States and the Pennsylvania Historical and Museum Commission, has appealed on the ground that Weinberg had failed to prove unnecessary economic hardship. The standard of review in an appeal from a local agency, where the trial court has taken no additional evidence, is whether constitutional rights have been violated, or an error of law has been committed, or a finding of fact of the agency necessary to support its adjudication is not supported by substantial evidence. *Tegzes v. Township of Bristol*, 504 Pa. 304, 472 A.2d 1386 (1984). Substantial evidence is such evidence as a reasonable mind might deem adequate to support a conclusion. *Murphy v. Department of Public Welfare*, 85 Pa.Commonwealth Ct. 23, 480 A.2d 382 (1984).

■ Reasonable restrictions may be imposed upon private property to preserve the public interest in historic landmarks, *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), so long as, inter alia, the means are not unduly oppressive upon the property holder, considering the economic impact of the regulation and the extent to which the government physically intrudes upon the property.

In *Penn Central*, the corporation had requested a permit from the Landmark Commission to build a fifty-five story tower on top of its Grand Central terminal building. The City disapproved the request and Penn Central appealed claiming a taking without just compensation. The Supreme Court decided that the city's landmark ordinance advanced a legitimate state interest in historic preservation saying that "cities may enact certain restrictions or controls to enhance the quality of life by preserving the character and desirable aesthetic features of a city". *Id.* at 129, 98 S.Ct. at 2661. The court then held that the taking analysis should focus on whether the historic property can offer a reasonable rate of return and whether the property is economically viable in its present form. The court then reviewed the specific economic issues and found that the historic

designation allowed the owners to "continue to use the property precisely as it has been used for the past 65 years: as a railroad terminal" and found that the owners were not prevented from receiving a "reasonable return", *id.* at 136, 98 S.Ct. at 2665, even though it was not the most profitable use, particularly when the owners were entitled to off-setting benefits such as the sale of transfer development rights to the unused air space.

The *Penn Central* rationale was followed by the Pennsylvania Supreme Court in *United Artists' Theater Circuit, Inc. v. City of Philadelphia,* 535 Pa. 370, 635 A.2d 612 (1993). In *United Artists'* the court did not see the possibility that the owner was wholly deprived of any profitable use, but said:

> There may be circumstances in which the mere designation of a property as historic would constitute a taking due to the extreme financial hardship resulting from such designation. No such facts have been presented in the instant case, nor need we decide here what level of financial hardship would meet this test.

> Moreover, we note that the Philadelphia Ordinance in question provides a vehicle for relief when the designation would cause a substantial hardship. The Ordinance provides relief for a party who asserts that he is deprived of 'any purpose for which it is or may be reasonably adapted, or where a permit application for alteration or demolition is based, in whole or in part, on financial hardship.'

*Id.* at 382, n. 3, 635 A.2d at 618, n. 3.

The Pittsburgh Ordinance, being Ordinance No. 20 of 1979, as amended, provides no such relief, but authorizes the Commission to issue a Certificate of Appropriateness of any demolition after hearing, and also provides (Subsection 513.7.1):

> The limitations upon the issuance of demolition or building permits ... for any historic structure ... shall not apply when the work involved in the permit has been ordered by the Bureau of Building Inspection or the Allegheny County Health Department for the preservation of the public health or safety.

The relief provided by the Philadelphia ordinance follows the holding in *First Presbyterian Church of York v. City Council of the City of York,* 25 Pa.Commonwealth Ct. 154, 162, 360 A.2d 257, 261 (1976), where the court said:

> Reverting to the test of *Maher v. City of New Orleans* [371 F.Supp. 653 (D.C.La. 1974)], applicable to district historic zoning, that the property owner must establish that the regulation precludes use of the property for any purpose for which it is reasonably adapted, pertinent reference may be made to familiar Pennsylvania cases employing substantially the same test to applications for use variances—that is, that such a variance must be granted if the property in question cannot be used or sold for any purpose permitted by the applicable zoning regulations but that it should be denied if the showing is merely that the property could be more gainfully used or sold for a purpose not allowed by such regulations.

The Commission argues that the owners failed to prove sufficient economic hardship to warrant the grant of a permit to demolish Gateway House. Amici curiae go further and argue that financial hardship should not be considered in this case because Weinberg entered upon a speculative investment with full knowledge that Gateway House was an historic structure which could not be demolished without the approval of the Commission.

However, both *Penn Central* and *United Artists'* hold that the economic impact in terms of financial hardship must be assessed in order to decide whether preservation of an historic structure continues to be a proper exercise of the police power. In *Penn Central,* it is clear that the private property owners would have been entitled to relief if they could have shown that Grand Central Terminal was not economically viable because it could no longer be used as a railroad terminal, producing a reasonable rate of return. In this case, the owners argue Gateway House can no longer be used as a residence, because it must be renovated, and such renovation is not economically feasible since the cost of necessary renovation would

impose a substantial financial hardship. We agree that economic hardship is a valid ground for relief, whether the private owner is a transportation company, a land developer or a home owner.

■ Amici curiae argue also, by analogy to the law of zoning governing the grant of variances, that an applicant who purchases an historic structure with knowledge of the restrictions, cannot claim economic hardship because he creates his own hardship. *See, e.g., McClure Appeal,* 415 Pa. 285, 203 A.2d 534 (1964). But the Commission and amici cite no authority applying this principle of zoning law to the law governing the designation and preservation of historic structures. If correct, then a purchaser of Grand Central Terminal would be required to preserve and maintain the Terminal regardless of subsequent financial loss.

Even if the law of unnecessary hardship were applicable in this case, Ryan points out, Pennsylvania Zoning Law and Practice, §§ 6.2.12–6.2.14 (1981), that the rule is not absolute; that *McClure* involved the purchase of residentially zoned land at a price so high as to preclude its use for residential purposes; and that, while the rule is applicable to an applicant who knowingly assumes an unusual investment risk in hopes of a commensurate gain, it should not be invoked against a purchaser who bought at a price which assumes that zoning will permit a reasonable use of the property. *See Forest Hills Borough Appeal,* 409 Pa. 392, 187 A.2d 166 (1963).

There is no evidence in this case that the property was purchased as a speculative investment at an excessive price in hope of changing the historic structure designation in order to reap a large profit. Weinberg purchased the property for a personal residence and spent about $36,000 in repairs before learning necessary renovations would entail the expenditure of an additional sum of $650,000 to $700,000, not including the purchase price of $175,000 and interim expenses. The Commission did find that the purchase price "should not be used as an element of the hardship argument, since a mistakenly high payment for the building was a matter under the control of the owners." (Commis-

sion's decision, p. 6.) Paradoxically, the Commission also found that there was evidence that the property could be sold as is for $200,000 to $300,000. The Commission also accepted evidence that the City, in 1989, assessed the property at $40,000 indicating a fair market value of $160,000. In hindsight, of course, Weinberg should have engaged an architect and a contractor to get an estimate of the cost of renovation, but such oversight can hardly be equated with assuming the risk of making a highly speculative investment. In this case, we find no authority and no evidence justifying the application of the unnecessary hardship rule.

The Commission also found no economic hardship, because Weinberg could sell the property as it now exists for perhaps $200,000 and $300,000; they could get a mortgage and renovate it for their personal residence, where economic hardship need not be considered; they could renovate it as a single family house and sell it and perhaps recoup their costs; they could renovate it as a two unit residence, in which case they could probably not recoup their costs.

■ The record shows this property has not been maintained or occupied since 1984 except for vagrants, vandals and rodents, nor is there any requirement in the historic designation ordinance requiring maintenance or occupation. It is clear that any purchaser must renovate the property, and the Commission has accepted the necessary cost of such renovation to be $650,000 to $700,000. There is no competent evidence that the property could be sold as is for $200,000 to $300,000 because Mr. Goldblum testified there were no comparable properties upon which he could base an expert opinion. He did testify, when pressed, that the house could possibly sell for $200,000 to $300,000 but that testimony was simply a layman's guess.

Furthermore, even when seeking a zoning variance, the law does not require a property owner to attempt to sell as a prerequisite to the grant of a variance. *Valley View Civic Association v. Zoning Board of Adjustment,* 501 Pa. 550, 462 A.2d 637 (1983). In this case, it is clear that a reasonable purchaser

would not buy this property if expert opinion shows he would suffer a substantial financial loss due to the cost of renovation.

■ The Commission's conclusion that Weinberg could borrow enough money to renovate the building as a personal residence, making the issue of economic hardship irrelevant, is without legal authority. The rights of a private property owner to use his property do not vary in this context because he is a homeowner, a transportation company or a land developer, nor on the extent of his personal wealth. *Penn Central; United Artists'; First Presbyterian Church of York.*

■ The Commission also claims Weinberg might be able to renovate the building as a single family residence and recoup his costs. This conclusion rests on the assertion that Mr. Goldblum testified such a residence might sell for as much as $800,000. But, as pointed out by the trial judge, viewing his testimony as a whole, Mr. Goldblum was of the firm opinion that the fair market value of Gateway House after renovation would not exceed $550,000, a figure $100,000 less than costs of renovation excluding the purchase price of $175,000 and interim expenses. When pressed by a Commission member, Mr. Goldblum conceded it was possible that someone might pay $800,000 for the property after renovation, but it is clear that was not his opinion of the fair market value at that time.

■ The Commission agreed that it was not economically feasible for the property to be renovated and sold as a two unit residence. It also agreed that the reasonable cost of renovation as a single family residence is $650,000 and did not disagree that Mr. Goldblum found the fair market value of such a house would not exceed $550,000, but erroneously concluded that Mr. Goldblum had equivocated in giving his opinion.

The situation was aptly summarized in the letter submitted on behalf of Chatham College dated June 7, 1991:

> The College believes that the Property continues to be an attraction to vagrants, vandals and rodents, a danger to the health and safety of its neighbors, an eyesore and an influence which adversely affects the value of neighboring properties. Some action should be taken as soon as possible to remediate this problem.
>
> The college also believes that the Property constitutes a significant historic structure. The College would prefer that the Property be renovated. Nevertheless, the College recognizes the significant cost required for such renovation and does not wish to create any undue hardship on the Weinbergs. The College has not reviewed expert reports relating to the cost of renovating the Property. If the cost of renovating the Property is in excess of the value of the Property after such renovation, the College would support the demolition of the structure . . .

This Court finds there was substantial evidence supporting the conclusion of the Commission that the cost of renovation as a single family residence was about $650,000 to $700,000, and there was no substantial evidence that the cost of renovating the property would not exceed the value of the property after renovation.

On the basis of this record it is not economically feasible for the present owners, nor any subsequent owners to undertake such costly renovation. It makes little sense to allow this historic structure to remain unoccupied and to permit it to continue to deteriorate, until the Allegheny County Health Department or the Pittsburgh Bureau of Building Inspection orders it to be demolished for the preservation of the public health or safety.

SMITH, J., concurs in result only.

### *ORDER*

NOW, December 19, 1994, the order of the Court of Common Pleas of Allegheny County, dated November 29, 1993, in the above-captioned case, is affirmed.